IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

KAREN E. DUPREY,

       Plaintiff,

vs.                                        No. CIV 08-0756 JB

TWELFTH JUDICIAL DISTRICT COURT,
State of New Mexico; HON. KAREN L. PARSONS,
Individually and in her official capacity as
Chief Judge, Twelfth Judicial District
Court, State of New Mexico; HON. EUGENIO S. MATHIS,
Individually, and in his official capacity as
Chairperson of the Judicial Grievance Board
convened at Santa Fe, New Mexico on Friday,
November 16, 2007 and re-convened on
5 December 2007; JAN PERRY,
Individually and in her official capacity as
Court Administrator, Twelfth Judicial District
Court, State of New Mexico; LORRI A. HATCHER,
Individually and in her official capacity as
Director, New Mexico Administrative Office
of Courts, Human Resources Division;
and VALERIE PARK, Individually and in her official capacity as
Project Manager, New Mexico Administrative
Office of the Courts Human Resources Division;

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Motion to Dismiss Pursuant to F.R.C.P.

12(b)(6) by Defendants Hatcher and Park, filed October 14, 2008 (Doc. 20). The Court held a

hearing on June 18, 2009. The primary issues are: (i) whether Defendant Valerie Park, in recording

the proceedings of the grievance hearing in which Plaintiff Karen E. Duprey appealed her demotion,

was acting in a quasi-judicial capacity and is entitled to absolute immunity; (ii) whether Park and

Defendant Lorri A. Hatcher were "acting for" Duprey's employer such that they are individually

liable under the New Mexico Human Rights Act, NMSA 1978 §§ 28-1-1 to 28-1-15 ("NMHRA"); (iii) whether any of Hatcher's or Park's actions gave rise to violations of Duprey's procedural due-process rights; (iv) whether Duprey can seek punitive damages against Hatcher and Park; and (v) whether the Court should award Park and Hatcher attorney's fees and impose sanctions under rule 11 of the Federal Rules of Civil Procedure against Duprey's attorney.  Pursuant to Duprey's stipulation in her briefing and at the hearing, the Court will dismiss the individual claims against Park and Hatcher for violations of Title VII and the Federal Age Discrimination in Employment Act, 29 U.S.C. §§ 621-634.  Because Park was acting in a non-discretionary, ministerial function, she is not entitled to absolute immunity.  The Court also finds that, in their capacities as employees in the Administrative Office of the Court, which supports the Twelfth Judicial District, Park and Hatcher acted for the Twelfth Judicial District, Duprey's employer.  The Court therefore believes they can be held individually liable under the NMHRA.  The Court finds, however, that Duprey has not alleged a due-process violation against either Hatcher or Park because Duprey received the process she was due – a hearing and an opportunity respond to allegations supporting her demotions – for the deprivation she suffered.  All allegations related to the internal-grievance investigation fail to give rise to a due-process violation because that internal-grievance investigation, which was conducted at Duprey's initiative, did not result in the deprivation of life, liberty, or property.  Because certain 42 U.S.C. § 1983 claims survive against Hatcher and Park, it is not appropriate at this time to dismiss Duprey's punitive damages claim.  Finally, the Court will not award costs or impose sanctions.

## FACTUAL BACKGROUND

Some of the factual details that the Court sets forth are not established in the record, but appear as allegations in the Complaint.  While the Court does not rely on those facts not set forth

in the record, the Court repeats them here for the sake of providing context.

Duprey was an employee of the Twelfth Judicial District Court for the State of New Mexico. See Complaint for Employment Discrimination and Retaliation and for Deprivation of Civil Rights Under Color of State Law ¶ 2, at 2, filed August 18, 2008 (Doc. 1)("Complaint").  She began working for the Twelfth Judicial District Court on August 31, 1995.  See id. ¶ 34, at 8.  In the calendar year 2000, Duprey competed for the position of Court Administrator.  See id. ¶ 36, at 8.  Although she alleges that she was highly qualified for the position, Duprey did not receive the promotion.  See id. ¶ 36, at 8.  Rather, another, less qualified employee received the job, and "from the outset exhibited jealousy and antipathy toward [Duprey], and directly and indirectly encouraged younger employees and minority employees working under [Duprey] to exhibit insubordination and discontent."  Id. ¶ 36, at 8.

Duprey alleges that she suffered various other negative actions at work, including denial of a pay raise because of an unfair evaluation, degrading and demeaning interrogations based on unfounded allegations made by Hispanic subordinates who had banded against her, a reprimand, and ultimately, a demotion.  See id. ¶¶ 37-43, at 9-10.  Duprey alleges in her Complaint that, after being demoted, she "filed an internal complaint of harassment pursuant to the New Mexico Judicial Branch Personnel Rules."  Id. ¶ 44, at 10.  Duprey also filed a grievance because of the demotion and had a hearing before the grievance board on November 16, 2007 and December 5, 2007.  See id. ¶¶ 46-48, at 10-11.  See Letter from Valerie Park to Karen Duprey (dated March 5, 2008)("March 5 Letter")(discussing Duprey's complaint of a hostile work environment and the internal-grievance investigation that ensued).

Hatcher was serving as the Director of Human Resources for the New Mexico Administrative Office of the Courts during the time periods related to this lawsuit.  See id. ¶ 21, at

5; Affidavit of Karen E. Duprey ¶ 3, at 1 (executed October 28, 2008)(Doc. 30-2)("Duprey Aff.")

Hatcher had ultimate responsibility for assuring the fair and impartial administration of Duprey's

grievance hearing and for the fair and impartial administration of the investigation into Duprey's

complaint of employment-related harassment.  See Complaint ¶ 22, at 6; Duprey Aff. ¶ 3, at 1.

At all relevant times, Park was a project manager for the New Mexico Administrative Office

of the Courts, Human Resources.  See Complaint ¶ 25, at 6; March 5 Letter at 5.  Park investigated

Duprey's complaint for harassment.  See Complaint ¶ 25, at 6.  Park was also in charge of

monitoring the audio-recording equipment that was used to make a record of the grievance hearing.

See id. ¶¶ 50-51, at 11.

After the November 16, 2007 portion of the grievance hearing and before the December 5

portion, Park revealed to Duprey and to Duprey's attorney that the audio recording from the

November 16 hearing had either been accidentally destroyed or was never recorded.  See id. ¶ 53,

at 12.   Because of the lost record, Duprey requested that the hearing be started over so that she

would be able to have a record for all of the proceedings.  See id. ¶ 55, at 12.  The request was

denied, and the second day of the hearing proceeded as scheduled.  See id. ¶ 56, at 12.  Ultimately,

a divided grievance board ruled against Duprey.  See id. ¶ 57, at 12-13.

Duprey alleges that, after the grievance hearing, Park conducted a "biased, superficial

investigation into Ms. Duprey's complaint of on-the-job harassment."  Id. ¶ 58, at 13; Duprey Aff.

¶¶ 15-16, at 5-6.  According to Duprey's allegations, Park committed multiple violations of the New

Mexico Judicial Branch Harassment Discrimination and Retaliation Policy, including failing and

refusing to interview any of Duprey's witnesses and conducting interviews in a biased and leading

manner.  See Duprey Aff. ¶¶ 15-16, at 5-6. Duprey also alleges that Hatcher failed and refused to

supervise and to correct Park's inadequate and biased investigation, and that Hatcher failed and

refused to supervise and to correct the biased and unfair March 5, 2008 report of that investigation. <u>See</u> Complaint ¶ 59, at 13; Duprey Aff. ¶¶ 17-19, at 6-7.

## PROCEDURAL BACKGROUND

Duprey filed her Complaint in the United States Court for the District of New Mexico on August 18, 2008.  Duprey acknowledges that Counts I and III, which reflect claims for employment discrimination in violation of Title VII of the Civil Rights Act of 1964 and for employment discrimination in violation of the Federal Age Discrimination in Employment Act, sound only against the employer, and not against Park and Hatch.  <u>See</u> Plaintiff's Response in Opposition to Defendants Hatcher and Park's Motion to Dismiss at 1, filed November 4, 2008 (Doc. 30). Although Duprey stipulates that Counts I and III do not sound against Park and Hatch, she has brought five counts against them: (i) Count II, for discrimination in violation of the NMHRA, <u>see</u> Complaint at 14; (ii) Count V, for employment retaliation in violation of the NMHRA, <u>see</u> Complaint at 16; (iii) Count VI, for denial of equal protection, adverse employment actions, harassment, and retaliation, <u>see</u> Complaint at 16; (iv) Count VII, for denial of due-process stemming from the conduct of the grievance hearing and the harassment investigation, <u>see</u> Complaint at 17; and (v) Count VIII, for punitive damages against, among others, Hatcher and Park, <u>see</u> Complaint at 18.

The Defendants contend that, because Hatcher was not an employer under Title VII, she cannot be sued in her individual capacity under Counts I through V.  <u>See</u> Defendants Hatcher and Park's Memorandum in Support of Motion to Dismiss Pursuant to Rule 12(b)(6) at 1-2, filed October 14, 2008 (Doc. 21)("Memo.").  The Defendants note that supervisory employees acting in their official capacities may be sued under Title VII as a means of suing the employer under an agency theory.  <u>See</u> Memo. at 2.  The Defendants contend, however, that Hatcher was not an agent

of the employer and is therefore not subject to individual liability.  See id.

The Defendants further maintain that Hatcher is not a proper party in her individual capacity to the due-process claim articulated in Count VII of the Complaint.  See Memo. at 3.  In the Defendants' view, Duprey pleads no facts that would support a conclusion that Hatcher violated Duprey's right to due-process.  See id.  The Defendants assert that, for a complaint to state a violation of procedural due-process, the plaintiff must identify some procedural right that the defendant transgressed.  See id.  According to the Defendants, the Complaint confirms that Duprey's September 21, 2007 internal complaint of harassment was investigated.  See id.  The Defendants therefore contend that Duprey's rights to procedural due-process were therefore satisfied.  Thus, the Defendants maintain that Duprey's allegation about Hatcher failing to supervise and correct Park's report of the investigation fails to state a claim.  See id. at 4.  The Defendants insist that Duprey had no right to a particular outcome – only to an investigation, which she received.  See id.

The Defendants' primary line of argument regarding Park is that the allegations related to her failing to record the November 16, 2007 grievance hearing fail to state a claim because Park is entitled to quasi-judicial immunity.  See Memo. at 4-5.  The Defendants note that Park's actions were purely ministerial in operating the tape-recording equipment for the hearing and that, like a monitor in a judicial proceeding in district court, Park is entitled to immunity.  See id. at 5.

The Defendants also insist that the Complaint fails to state a due-process claim against Park for the same reasons that the Complaint fails to state a due-process claim against Hatcher.  See Memo. at 5.  Specifically, the Defendants argue that the Complaint acknowledges that Duprey's internal complaint had been investigated.  See id.  Thus, according to the Defendants, Duprey received the process that was due to her.  See id.

Duprey responds that, while the Defendants are correct that Counts I and III are properly

stated against only the employer, Counts II, V, VI, VII, and VIII are properly stated against Hatcher and Park.  See Response at 1.  Duprey argues that individual agents of an employer can be sued for civil rights violations under the NMHRA because the NMHRA defines employer as "any person employing four or more persons and any person acting for an employer."  Response at 3 (internal quotation marks and citations omitted).  Duprey maintains that a person acting for the employer would include a human resources director like Hatcher and a record keeper at an administrative proceeding like Park.  See Response at 3.

Duprey argues that she has appropriately pled due-process claims against Hatcher and Park in Count VII of the Complaint.  See Response at 4.  Duprey submits an affidavit to support her due-process claim.  In the affidavit, she repeats the allegation that the recording, which contained testimony critical to her case, was lost.  See Duprey Aff. ¶¶ 7-8, at 2-3.  Duprey alleges that Hatcher shares in Park's liability for the lost record because of Hatcher's position as Human Resources Director.  See id. ¶¶ 5-8, at 2-3.  Duprey also alleges other acts that she believes deprived her of due process, including a "barely audible" recording of the December 5 hearing, id. ¶ 10, at 3, assembly by Hatcher of a grievance panel consisting of individuals with whom Duprey had a conflict, see id. ¶ 5, at 2, inadequate time for the grievance proceeding, see id. ¶¶ 12-13, at 4-5, Hatcher's failure to task Duprey's requested investigation under the Harassment policy to someone with more experience than Park, see id. ¶ 14, at 5, Park's failure to allow Duprey to review and supplement the witness list for the grievance investigation, see id. ¶ 15, at 5, Park's participation in both the grievance hearing and the grievance investigation, which suggests Park's investigation was tainted by what she heard at the grievance hearing, see id. ¶ 19, at 6-7, and Hatcher's failure to prevent Park's improper conduct, see id. ¶ 20, at 7.  Duprey argues that these allegations from her affidavit preclude dismissal of her due-process claims against Hatcher and Park.  See Response at 4.

-7-

Regarding Park's immunity defense, Duprey argues that the procedural safeguards that would constitute the hallmark of judicial process were not present at the grievance hearing and that its participants, including Park, should not enjoy immunity.  See Response at 4-10.

Duprey insists that punitive damages are appropriate in the 42 U.S.C. § 1983 claims.  Duprey believes she will recover on those claims.  She therefore contends that Count VIII should not be dismissed.

Finally, Duprey takes issues with the Defendants attaching "unauthenticated, inadmissible exhibits to these briefs."  Response at 2.  In Duprey's view, "Defendants are trying to pack the record with inadmissible hearsay and that is not appropriate, particularly in briefing on motions to dismiss, which are reserved for purely legal matters."  Id.

In their reply, the Defendants argue that neither Hatcher nor Park were "acting for the employer," because neither had the authority to impose an adverse employment relationship on Duprey or to otherwise adversely affect Duprey's employment relationship with the Twelfth Judicial District, Duprey's employer.  Defendants Hatcher and Park's Reply in Support of Motion to Dismiss at 2, filed November 21, 2008 (Doc. 32)("Reply").

The Defendants also argue that the due-process claims fail for several reasons.  First, they contend that the Complaint alleges no acts or omission by Hatcher related to the grievance hearing that would give rise to a constitutional violation.  See id. at 4.  They also note that the allegations regarding Hatcher's failure to supervise Park's internal-grievance investigation do not support a due-process claim because the investigation was one that Duprey initiated and because the investigation did not pose a risk of any disciplinary action against Duprey.  See id.

At the hearing, the Defendants argued that Hatcher and Park should not be liable for activity related to the grievance hearing because Hatcher and Park were not responsible for the substantive

decisions that the grievance board rendered.  See Transcript of Hearing at 46:4-12 (Maynes)(taken June 19, 2009)("Tr.").[1]  The Defendants also argued that Hatcher was a functionary to the grievance hearing, carrying out mundane, menial tasks such as finding a room in which to hold the hearing and making sure the room was clean.  See id. at 46:13-20 (Maynes).  The Defendants therefore insisted that opening the doors to suits against actors such as Hatcher in this context would give rise to vexatious litigation against other support staff performing ministerial or technical functions related to quasi-judicial proceedings.  See id. at 47:1-16 (Maynes).

Duprey argued at the hearing that Park should not have immunity because Park was not a decision-maker, but was instead a fact gatherer and a technical logistical support provider.  See id. at 44:16-20 (Montoya).  Duprey therefore insisted that Park's function was not similar to those of a judicial officer.  See id. at 44:19-21 (Montoya).  Thus, Duprey contended that Park should not enjoy immunity from suit.  See id. at 45:1-2 (Montoya).

## RELEVANT LAW REGARDING MOTIONS TO DISMISS

Under rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994).  The sufficiency of a complaint is a question of law, and when considering and addressing a rule 12(b)(6) motion, a court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor. See Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006); Hous. Auth. of Kaw Tribe v. City of

---

[1]  The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

Ponca City, 952 F.2d 1183, 1187 (10th Cir. 1991).

A complaint challenged by a rule 12(b)(6) motion to dismiss does not require detailed factual allegations, but a plaintiff's obligation to set forth the grounds of his or her entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level . . . ." Id. at 1965 (internal citation omitted). "[T]he Supreme Court recently . . . prescribed a new inquiry for us to use in reviewing a dismissal: whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'" Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570). "The [Supreme] Court explained that a plaintiff must 'nudge his claims across the line from conceivable to plausible' in order to survive a motion to dismiss." Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d at 1177 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)(alterations omitted). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d at 1177. The Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)(internal citations omitted).

The Supreme Court has recently expounded upon the meaning of Bell Atl. Corp. v.

-10-

<u>Twombly</u>.

> Two working principles underlie [the] decision in *Twombly*.  First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. . . .  Second, only a complaint that states a plausible claim for relief survives a motion to dismiss.  Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.

<u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937, 1949-50 (2009)(citation omitted).  Additionally, the Supreme Court has commented:

> In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.

<u>Id.</u> at 1950.

A court must convert a motion to dismiss into a motion for summary judgment if "matters outside the pleading are presented to and not excluded by the court," and "all parties . . . [must be] given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed. R. Civ. P. 12(d).  Facts subject to judicial notice may be considered without converting a motion to dismiss into a motion for summary judgment.  <u>See</u> <u>Grynberg v. Koch Gateway Pipeline Co.</u>, 390 F.3d 1276, 1279 n.1 (10th Cir. 2004)(citing 27A <u>Fed. Proc., L.Ed.</u> § 62:520 (2003)). Furthermore, when considering a motion to dismiss, "the court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record."  <u>Van Woudenberg v. Gibson</u>, 211 F.3d 560, 568 (10th Cir. 2000) <u>abrogated on other grounds by</u> <u>McGregor v. Gibson</u>, 248 F.3d 946, 955 (10th Cir. 2001). A court may consider documents to which the complaint refers if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity.  <u>See</u> <u>Jacobsen v. Deseret Book Co.</u>, 287 F.3d 936, 941-42 (10th Cir. 2002).  If,

however, a document is not incorporated by reference or attached to the complaint, but is referred

to in the complaint and is central to the plaintiff's claim, the defendant may submit an "indisputably

authentic copy to the court to be considered on a motion to dismiss."   GFF Corp. v. Assoc.

Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir. 1997).  See 5A C.  Wright & A. Miller,

Federal Practice & Procedure § 1327 (3d ed. 2004)("[W]hen the plaintiff fails to introduce a

pertinent document as part of her pleading . . . the defendant may introduce the document as an

exhibit to a motion attacking the sufficiency of the pleading.").

### LAW REGARDING MOTIONS FOR SUMMARY JUDGMENT

Summary judgment shall be granted "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter

of law."  Fed. R. Civ. P. 56(c).  The movant bears the initial burden of "show[ing] that there is an

absence of evidence to support the nonmoving party's case."  Bacchus Indus., Inc. v. Arvin Indus.,

Inc., 939 F.2d 887, 891 (10th Cir. 1991)(internal quotation marks omitted).  See Celotex Corp. v.

Catrett, 477 U.S. 317, 323 (1986).

Once the movant meets this burden, rule 56(e) requires the nonmoving party to designate

specific facts showing that there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S.

at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Vitkus v. Beatrice Co., 11 F.3d

1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must

set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters

for which it carries the burden of proof.")(internal quotation marks omitted); Otteson v. United

States, 622 F.2d 516, 519 (10th Cir. 1980)("However, 'once a properly supported summary

judgment motion is made, the opposing party may not rest on the allegations contained in his

complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.'")(quoting Coleman v. Darden, 595 F.2d 533, 536 (10th Cir. 1979)).  The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  Rule 56 provides that "an opposing party may not rely merely on allegations or denials in its own pleadings; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).

It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his [or her] pleadings."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 256.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990).  "The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation."  Colony Nat'l Ins. Co. v. Omer, No. 07-2123, 2008 WL 2309005 at * 1 (D. Kan. June 2, 2008)(citing Fed. R. Civ. P. 56(e) and Argo v. Blue Cross and Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'"  Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005 at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 250.  The mere existence of a scintilla of evidence will not avoid summary judgment.  See Vitkus v. Beatrice Co., 11 F.3d at 1539.  There must be sufficient evidence on which the factfinder could

reasonably find for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251

(quoting Schuylkill and Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v.

Beatrice Co., 11 F.3d at 1539.  "[T]here is no evidence for trial unless there is sufficient evidence

favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely

colorable . . . or is not significantly probative, . . .  summary judgment may be granted."  Anderson

v. Liberty Lobby, Inc., 477 U.S. at 249 (internal citations omitted).  Where the record taken as a

whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine

issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## RELEVANT LAW REGARDING ABSOLUTE IMMUNITY

It is well established that "judges of courts of superior or general jurisdiction are not liable

to civil actions for their judicial acts, even when such acts are in excess of their jurisdiction, and are

alleged to have been done maliciously or corruptly."  Stump v. Sparkman, 435 U.S. 349, 355-56

(1978).  That same immunity continues even if the judge's "exercise of authority is flawed by the

commission of grave procedural errors."  Id. at 359.

The Supreme Court has emphasized that a judge's immunity from civil liability "is

overcome in only two sets of circumstances.  First, a judge is not immune from liability for

nonjudicial acts, i.e., actions not taken in the judge's judicial capacity.  Second, a judge is not

immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction."

Mireles v. Waco, 502 U.S. 9, 11-12 (1991) (citations omitted).  The Supreme Court has also held

that absolute judicial immunity was not affected or abolished "by § 1983, which makes liable 'every

person' who under color of law deprives another person of his civil rights."  Pierson v. Ray,  386

U.S. 547, 554 (1967), overruled in part on other grounds by Harlow v. Fitzgerald, 457 U.S. 800

(1982).

-14-

The Tenth Circuit has also recognized that "officials in administrative hearings can claim the absolute immunity that flows to judicial officers if they are acting in a quasi-judicial fashion." Guttman v. Khalsa, 446 F.3d 1027, 1033 (10th Cir. 2006)(citing Butz v. Economou, 438 U.S. 478, 514 (1978)). For an official at an administrative hearing to enjoy absolute immunity, "'(a) the officials' functions must be similar to those involved in the judicial process, (b) the officials' actions must be likely to result in damages lawsuits by disappointed parties, and (c) there must exist sufficient safeguards in the regulatory framework to control unconstitutional conduct.'" Guttman v. Khalsa, 446 F.3d at 1033 (quoting Horwitz v. State Bd. of Med. Examiners, 822 F.2d 1508, 1513 (10th Cir. 1987)).

In Guttman v. Khalsa, a doctor who suffered from depression and post-traumatic stress disorder had appeared before the Impaired Physicians Committee of the New Mexico Board of Medical Examiners to respond to a series of complaints about his professional conduct. See Guttman v. Khalsa, 446 F.3d at 1030. The Committee in Guttman v. Khalsa issued a "Notice of Contemplated Action and Order of Summary Suspension" of the doctor's medical license based on alleged mental illness and lying to the Committee. Id. In Guttman v. Khalsa, the New Mexico Board of Medical Examiners then held a hearing, during which one of the defendants acted as Administrative Prosecutor. See id. The New Mexico Board of Medical Examiners in Guttman v. Khalsa revoked the doctor's medical license pursuant to its statutory authority to do so. See id.

The doctor in Guttman v. Khalsa appealed the decision to the Seventh Judicial District of New Mexico. See id. The Seventh Judicial District of New Mexico denied the appeal, and the doctor then appealed to the New Mexico Court of Appeals. See id. After the New Mexico Court of Appeals affirmed, the doctor in Guttman v. Khalsa filed a petition for certiorari with the Supreme Court of New Mexico. See id. Before the Supreme Court of New Mexico could act on the petition,

-15-

the doctor filed a lawsuit in federal court, alleging, among other things, violations of his constitutional rights.  See id.

The Tenth Circuit in Guttman v. Khalsa held that the Rooker-Feldman doctrine did not bar the doctor's federal lawsuit because the state-court lawsuit was not final.  See id. at 1032.  The Tenth Circuit in Guttman v. Khalsa found, however, that the Administrative Prosecutor and the individual who presided over the three-day hearing in front of the New Mexico Board of Medical Examiners enjoyed absolute immunity.  See id. at 1032.  The basis for the hearing officer's immunity in Guttman v. Khalsa was that he had served a quasi-judicial function.  See id. at 1032.

The Tenth Circuit in Guttman v. Khalsa also relied on an earlier case: Horwitz v. State Bd. of Medical Examiners of State of Colo., 822 F.2d 1508 (10th Cir. 1987).  In Horwitz v. State Bd. of Medical Examiners of State of Colo., the Tenth Circuit concluded that members of the State Board of Medical Examiners for the State of Colorado enjoyed absolute immunity for actions it took in filing a formal complaint against a doctor, and in temporarily suspending his right to practice medicine pending investigations and hearings.  See 822 F.2d at 1510, 1515.  The Tenth Circuit in Horwitz v. State Bd. of Medical Examiners of State of Colo. reasoned that the defendant Board members were performing adjudicatory and prosecutorial functions.  See id. at 1515.  The Tenth Circuit in  Horwitz v. State Bd. of Medical Examiners of State of Colo. also noted:

> There exists a strong need to insure that individual Board members perform their functions for the public good without harassment or intimidation. There exist adequate due process safeguards under Colorado law to protect against unconstitutional conduct without reliance upon private damages lawsuits. It is important to insulate Board members from political influences in meeting their adjudicatory responsibilities in the adversarial setting involving licensure to practice medicine. Public policy requires that officials serving in such capacities be exempt from personal liability.

Id.  Finally, the Tenth Circuit pointed out the Board members' functions, observing that Board

-16-

members

> serve in the prosecutorial role in that they, among other things, initiate complaints, start hearings, make investigations, take evidence, and issue subpoenas. They also serve in the adjudicative role, as judges. Thus, the Board duties are "functionally comparable" to a court of law. And we are reminded that, with respect to immunity, we must include all acts of the official performing statutory duties as having "[m]ore or less connection with the general matters committed by law" to his station.

Id.

Although certain officers enjoy immunity from suit for acts taken in a quasi-judicial setting, the Supreme Court has held that court reporters do not enjoy such immunity.  Rejecting a court reporter's claim of absolute immunity, the Supreme Court has stated: "We are also unpersuaded by the contention that our functional approach to immunity . . . requires that absolute immunity be extended to court reporters because they are part of the judicial function."  Antoine v. Byers & Anderson, Inc., 508 U.S. 429, 435 (1993).  Rather, in the Supreme Court's view,

> The doctrine of judicial immunity is supported by a long-settled understanding that the independent and impartial exercise of judgment vital to the judiciary might be impaired by exposure to potential damages liability.  Accordingly, the "touchstone" for the doctrine's applicability has been "performance of the function of resolving disputes between parties, or of authoritatively adjudicating private rights." [Burns v. Reed,] 500 U.S. [478,] 500 [(1991)](SCALIA, J., concurring in judgment in part and dissenting in part). When judicial immunity is extended to officials other than judges, it is because their judgments are "functional[ly] comparab[le]" to those of judges – that is, because they, too, "exercise a discretionary judgment" as a part of their function.  Imbler v. Pachtman, 424 U.S., at 423, n. 20 . . . .

Antoine v. Byers & Anderson, Inc., 508 U.S. at 435-36 (footnote excluded)(final two alterations in Antoine v. Byers & Anderson, Inc.).

In light of this understanding of judicial immunity, the Supreme Court found that the function that court reporters perform is not one that would lead to a grant of immunity.  See id. at 436.  The Supreme Court reasoned that court reporters "are afforded no discretion" in carrying out their duty, and that they are "not absolutely immune because their duties are ministerial, not

-17-

discretionary in nature."  Id. (internal quotation marks and citations omitted).

## RELEVANT LAW REGARDING PROCEDURAL DUE PROCESS

The Fourteenth Amendment protects citizens from the deprivation of "life, liberty, or property, without due process of law."  U.S. Const. amend XIV, § 1.  Courts engage in a two-step inquiry to determine whether an individual's procedural due-process rights were violated: "(1) Did the individual possess a protected property interest to which due process protection was applicable? (2) Was the individual afforded an appropriate level of process?"  Camuglia v. City of Albuquerque, 448 F.3d 1214, 1219 (10th Cir. 2006) (citation and internal quotations omitted).  See Ripley v. Wyoming Medical Center, Inc., 559 F.3d 1119, 1122 (2009) ("To set forth an actionable procedural due process claim, a plaintiff must demonstrate: (1) the deprivation of a liberty or property interest and (2) that no due process of law was afforded.")(citations and internal quotation marks omitted). "In procedural due process claims, the deprivation by state action of a constitutionally protected interest in "life, liberty, or property" is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest without due process of law."  Zinermon v. Burch, 494 U.S. 113, 125 (1990).  Furthermore, "[a] due process claim . . . can only be maintained where there exists a constitutionally cognizable liberty or property interest with which the state has interfered."  Steffey v. Orman, 461 F.3d 1218, 1221 (10th Cir. 2006).

Before the government acts to impair an individual's property interest, the individual "is entitled to some sort of hearing . . . , although the hearing need not necessarily provide all, or even most, of the protections afforded by a trial."  Camuglia v. City of Albuquerque, 448 F.3d at 1220. To evaluate whether procedural protections are constitutionally adequate, a court weighs several factors:

First, the private interest that will be affected by the official action; second, the risk

of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Mathews v. Eldridge, 424 U.S. 319, 335 (1976).

## RELEVANT LAW REGARDING BIAS IN JUDICIAL PROCEEDINGS

In some cases, the Constitution requires a judge's recusal.  See Caperton v. A.T. Massey Coal Co., Inc., 129 S.Ct. 2252, 2265 (2009).  Caperton v. A.T. Massey Coal Co., Inc. arose out of the Supreme Court of Appeals of West Virginia's reversal of a trial-court judgment which had entered a jury verdict of $50 million against A.T. Massey Coal Co., Inc. ("Massey") for fraudulent misrepresentation, concealment, and tortious interference with existing contractual relations.  See id. at 2257.  A five-justice panel on the Supreme Court of Appeals of West Virginia heard the appeal, and reversed the trial-court judgment 3-2 after one of the justices in the majority denied a recusal motion.  See id. at 2256.

The motion to recuse was based on one of the justices having received substantial contributions from Massey's chairman, chief executive officer, and president for his previous re-election campaign.  See id.  As the Supreme Court noted, Massey's CEO provided approximately $3 million, which constituted more than the total amount spent by the judge's other supporters and three times the amount spent by the judge's own committee.  See id. at 2257.  Massey's CEO was, in effect, the judge's largest financial contributor.  The plaintiff filed a motion to recuse based on the CEO's campaign activity for the judge, and the judge denied the motion.  See id. at 2257-58.

Recognizing that, at times, "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable," id. at 2260 (internal quotation marks and citations omitted), the Supreme Court found: "On these extreme facts the probability of actual bias

rises to an unconstitutional level." Id. at 2265. The Supreme Court applied an objective standard to determine whether the probability of actual bias was unconstitutionally high. Under that standard, the Supreme Court asked whether, "under a realistic appraisal of psychological tendencies and human weakness, the interest poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented." Id. at 2263 (internal quotation marks and citations omitted).

> To support its conclusion under the objective standard, the Supreme Court reasoned:

> Blankenship's [The CEO] campaign efforts had a significant and disproportionate influence in placing Justice Benjamin on the case. Blankenship contributed some $3 million to unseat the incumbent and replace him with Benjamin. His contributions eclipsed the total amount spent by all other Benjamin supporters and exceeded by 300% the amount spent by Benjamin's campaign committee.

Id. at 2264. Moreover, the "temporal relationship between the campaign contributions, the justice's election, and the pendency of the case is also critical. It was reasonably foreseeable, when the campaign contributions were made, that the pending case would be before the newly elected justice." Id. at 2264-65. Thus, the Supreme Court concluded that there was a

> serious risk of actual bias – based on objective and reasonable perceptions – when a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case by raising funds or directing the judge's election campaign when the case was pending or imminent.

Id. at 2263-64.

## PROPER PARTIES TO SUITS UNDER THE NMHRA

The NMHRA makes it an unlawful discriminatory practice for

> an employer, unless based on a bona fide occupational qualification or other statutory prohibition, to refuse to hire, to discharge, to promote or demote or to discriminate in matters of compensation, terms, conditions or privileges of employment against any person otherwise qualified because of race, age, religion, color, national origin, ancestry, sex, physical or mental handicap or serious medical condition, or, if the employer has fifty or more employees, spousal affiliation;

> provided, however, that 29 U.S.C. Section 631(c)(1) and (2) shall apply to discrimination based on age; or, if the employer has fifteen or more employees, to discriminate against an employee based upon the employee's sexual orientation or gender identity. . . .

NMSA 1978 § 28-1-7.  The NMHRA also allows individuals to bring a lawsuit in the appropriate district court after exhausting their administrative remedies.  See Luboyeski v. Hill, 117 N.M. 380, 382, 872 P.2d 353, 355 (1994). The NMHRA provides:

> A person aggrieved by an order of the commission may obtain a trial de novo in the district court of the county where the discriminatory practice occurred or where the respondent does business by filing a notice of appeal within ninety days from the date of service of the commission's order.

NMSA 1978 § 28-1-13A.

The NMHRA defines "employer" as "any person employing four or more persons and any person acting for an employer."  NMSA 1978 § 28-1-2B.  While acknowledging that there is generally no personal liability under Title VII, the Supreme Court of New Mexico has "reject[ed] the proposition that there can exist no individual liability under the NMHRA."  Sonntag v. Shaw, 130 N.M. 238, 243, 22 P.3d 1188, 1193 (2001).  In Sonntag v. Shaw, a defendant relied on Title VII case law to argue that the owner of a corporation could not be sued as an individual under the NMHRA.  See  Sonntag v. Shaw, 130 N.M. at 243, 22 P.3d at 1193.  Although it held that the defendant could not be held personally liable, given that the plaintiff had failed to exhaust administrative remedies, the Supreme Court of New Mexico declined to close the door on individual liability under the NMHRA.  See  Sonntag v. Shaw, 130 N.M. at 243, 22 P.3d at 1193.

The Supreme Court of New Mexico noted in Sonntag v. Shaw:

> [T]his Court has acknowledged the possibility of individual liability for discrimination claims. Cf. Luboyeski v. Hill, 117 N.M. 380, 382, 872 P.2d 353, 355 (1994) (affirming the dismissal of individual defendants because the plaintiff failed to exhaust administrative remedies against them); Mitchell-Carr v. McLendon, 1999-NMSC-025, ¶ 10, 127 N.M. 282, 980 P.2d 65 (citing Luboyeski). As Plaintiff

suggests, the potential for individual liability for discrimination claims is rooted in the language of the NMHRA itself, which forbids "any person" from supporting a discriminatory practice. Section 28-1-7(I); see NMSA 1978, § 28-1-2(A) (1993) (including within its definition of "person" for purposes of the NMHRA, "one or more individuals").

Sonntag v. Shaw, 130 N.M. at 243, 22 P.3d at 1193.

## RELEVANT LAW REGARDING PUNITIVE DAMAGES

"[A] jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." Smith v. Wade, 461 U.S. 30, 56 (1983). Moreover, punitive are available under Title VII in situations where a plaintiff demonstrates that a respondent discriminated with malice or with reckless indifference to federally protected constitutional rights. See Hysten v. Burlington Northern Santa Fe Ry. Co., 530 F.3d 1260, 1278 (10th Cir. 2008). "The Title VII standard for punitive damages requires something more than the employer's mere awareness that its conduct constitutes intentional discrimination however egregious it might be." Id. Thus, "[t]he terms 'malice' or 'reckless indifference' [in § 1981a(b)(1) ] pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." Id. (internal quotation marks and citations omitted).

## STANDARD FOR ISSUING SANCTIONS UNDER RULE 11

Rule 11 of the Federal Rules of Civil Procedure provides:

**(c) Sanctions.**

> **(1) In General.** If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation. Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee.

-22-

**(2) Motion for Sanctions.** A motion for sanctions must be made separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b). The motion must be served under Rule 5, but it must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets. If warranted, the court may award to the prevailing party the reasonable expenses, including attorney's fees, incurred for the motion.

**(3) On the Court's Initiative.** On its own, the court may order an attorney, law firm, or party to show cause why conduct specifically described in the order has not violated Rule 11(b).

**(4) Nature of a Sanction.** A sanction imposed under this rule must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated. The sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation.

Fed. R. Civ. P. 11 (bold in original).   "If after reasonable inquiry, a competent attorney could not form a reasonable belief that [a] pleading is well grounded in fact and is warranted by existing law . . . . then such conduct is sanctionable under Rule 11."   Adamson v. Bowen, 855 F.2d 668, 673 (10th Cir. 1988).  The main purpose behind rule 11 sanctions is misconduct deterrence not defense compensation.  See Kirk Capital Corp. v. Bailey, 16 F.3d 1485, 1490 (8th Cir. 1994); Fed. R. Civ. P. 11(c)(4).  Sanctions are not warranted where there is a minor or tangential misrepresentation by a party. See Carona v. Falcon Services Company, Inc., 72 F. Supp. 2d at 733.  If, considering the "totality of the circumstances," the court finds that the misrepresentation is an honest mistake, sanctions are not warranted. Id.

## ANALYSIS

The Defendants' primary grounds for dismissal are: (i) Park is immune from suit for her actions taken at the grievance hearing; (ii) Hatcher and Park cannot be sued individually under the

NMHRA; and (iii) Duprey has not alleged facts against Hatcher and Park amounting to a due-process violation. The motion was styled a motion to dismiss pursuant to rule 12(b)(6). Under rule 12(b)(6), the Court would normally rule on the face of the pleadings, based on the standards set forth in Bell Atl. Corp. v. Twombly. Accordingly, dismissal would be appropriate if, viewing the allegations in the Complaint in the light most favorable to Duprey, Duprey failed to nudge her claims across the line from conceivable to plausible. See Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d at 1177 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 570). In this case, however, the Court will not be applying the 12(b)(6) standard.

In its Memorandum Opinion and Order, entered July 10, 2009 (Doc. 47)("July 10 MOO"), the Court notified the parties that it was converting the motion to dismiss into a motion for summary judgment and gave Duprey ten days to respond with any additional materials she wanted the Court to consider. The Court also gave the Defendants ten days to submit authenticated versions of the exhibits it originally submitted.

On July 22, 2009, in response to the Court's notice that it was converting this motion to a motion for summary judgment, Duprey filed a supplemental response through which she requested discovery before the Court ruled on the due-process issues. See Plaintiff's Supplemental Response in Opposition to Defendants Hatcher and Park's Motion to Dismiss at 1-2, filed July 22, 2009 (Doc. 54). Duprey's attorney attached an affidavit prepared pursuant to rule 56(f) to support the request for discovery. See Affidavit of Dennis W. Montoya (executed July 22, 2009)(Doc. 54-2)("Montoya Aff."). After careful consideration of these new materials, however, the Court determines that it will deny the request for discovery and will proceed to decide the motion for summary judgment.

In converting the motion to a motion for summary judgment, the Court explained that, "in this case, both parties have submitted materials outside the pleadings in support of their respective

positions.  Some of those materials cannot properly be subjected to judicial notice." July 10 MOO

at 3.  Furthermore, the Court notes that, "conversion is proper when the non-movant appends

materials to his opposition and urges the court to consider them." Whitesal v. Sengenberger, 222

F.3d 861, 866 (10th Cir. 2000).  In this case, Duprey, the non-moving party, attached an affidavit

to her response and relied upon it extensively in opposing Hatcher and Park's contentions.  On July

20, 2009, Hatcher and Park submitted authenticated versions of their exhibits by way of a

supplemental filing. See Supplemental Filing in Support of Motion to Dismiss Defendants Lorri

Hatcher and Valerie Park, filed July 20, 2009 (Doc. 51).

     The Court therefore treats this motion to dismiss as a motion to summary judgment.

Accordingly, the proper standard will be whether "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter

of law." Fed. R. Civ. P. 56(c).

     Treating this motion as a motion for summary judgment, the Court will dismiss the Title VII

Federal Age Discrimination in Employment Act claims against Park and Hatcher, based on Duprey's

concession.  The Court finds that Park is not immune from suit for her actions related to the

grievance hearing.  Moreover, both Hatcher and Park can be sued individually under the NMHRA.

The Court also finds that neither Hatcher nor Park engaged in any activity that would amount to a

deprivation of procedural due-process.  Hatcher and Park are also not entitled to dismissal of

Duprey's punitive damages claim.  Finally, the Court will not award fees or impose sanctions.

## I.    THE COURT WILL DENY THE REQUEST MADE PURSUANT TO THE RULE 56(f) AFFIDAVIT AND WILL PROCEED TO DECIDE THE MOTION FOR SUMMARY JUDGMENT.

     Before the Court decides the due-process issues raised in the motion to dismiss, which the

Court has converted into a motion for summary judgment, Duprey asks the Court to permit discovery. In the rule 56(f) affidavit, her attorney submits that he "reasonably believes that discovery would reveal details about the involvement of Defendants Hatcher and Park in the matters surrounding the erasure or other spoliation of a significant part of the hearing record in Ms. Duprey's grievance hearing." Montoya Aff. ¶ 4, at 1. Her attorney also states: "The facts as to Park's role need to be explored in discovery before her immunity motion can be decided." Id. ¶ 6, at 1-2. Duprey therefore asks the Court to defer ruling on the due-process claim until discovery is complete, and asks that she have the opportunity to supplement her briefing and exhibits upon completion of the requested discovery. See id. ¶¶ 5-6, at 1-2.

The Court finds that the affidavit that Duprey's attorney has submitted does not demonstrate with a sufficient degree of specificity what discovery Duprey is seeking and how that discovery would create a genuine issue of material fact. Rule 56(f) allows litigants to request relief from the Court when they are unable to produce facts to contest a motion for summary judgment. Rule 56(f) provides:

> **When Affidavits Are Unavailable**. If a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> (1) deny the motion;
>
> (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or
>
> (3) issue any other just order.

Fed. R. Civ. P. 56(f) (bold in original). "Unless dilatory or lacking in merit," a party's 56(f) application "should be liberally treated." Jensen v. Redevelopment Agency of Sandy City, 998 F.2d 1550, 1554 (10th Cir. 1993)(internal quotation marks omitted). "The general principle of Rule 56(f) is that summary judgment should be refused where the nonmoving party has not had the opportunity

to discover information that is essential to his opposition." <u>Price v. W. Res., Inc.</u>, 232 F.3d 779, 783 (10th Cir. 2000)(internal quotation marks omitted).  Rule 56(f) does not require, however, that summary judgment not be entered until discovery is complete.  <u>See id.</u> at 784.

"Rule 56(f) is not a license for a fishing expedition." <u>Lewis v. Ft. Collins</u>, 903 F.2d 752, 758 (10th Cir. 1990).  To invoke rule 56(f) the party filing the affidavit must state with specificity how the desired time would allow it to meet its burden in opposing summary judgment.  <u>See</u> <u>Jensen v. Redevelopment Agency of Sandy City</u>, 998 F.2d at 1554.  Rule 56(f) may not be invoked based solely upon the assertion that discovery is incomplete or that specific facts necessary to oppose summary judgment are unavailable.  <u>See id.</u>  The Tenth Circuit has summarized rule 56(f)'s requirements as follows:

> A prerequisite to granting relief  pursuant to Rule 56(f) is an affidavit furnished by the nonmovant.  Although the affidavit need not contain evidentiary facts, it must explain why facts precluding summary judgment cannot be presented.  This includes identifying the probable facts not available and what steps have been taken to obtain these facts.  In this circuit, the nonmovant also must explain how additional time will enable him to rebut movant's allegations of no genuine issue of fact.

<u>Price v. W. Res., Inc.</u>, 232 F.3d at 783 (internal quotation marks, citations, and brackets omitted).  "A rule 56(f) affidavit must state, with specificity, what additional discovery is believed necessary." <u>Schaefer v. Antill</u>, 2007 WL 709046 at *10 (D.N.M.)(Browning, J.)(citing <u>Burke v. Utah Transit Auth. and Local 382</u>, 462 F.3d 1253, 1264 (10th Cir. 2006) and <u>Chavez v. Perry</u>, 142 Fed. Appx. 325, 334 (10th Cir. 2005)).

The affidavit Duprey's attorney has executed requests that the Court allow him to "explore[]" facts regarding Park's involvement in the grievance hearing, and mentions a belief that discovery would "reveal details about the involvement of Defendants Hatcher and Park in the matters surrounding the erasure or other spoliation" of the grievance-hearing record from November

-27-

16, 2007.  Montoya Aff. ¶¶ 4 & 6, at 1-2.  These requests are the most specific ones that Mr. Montoya has included in his affidavit.  These requests, however, are generalizations, and give no hint of what specific information he seeks or how the information would create a genuine issue of material fact.  In addition, a rule 56(f) affidavit is not properly granted to explore.  While rule 56(f) requests "should be liberally treated," Jensen v. Redevelopment Agency of Sandy City, 998 F.2d at 1553, the rule "is not a license for a fishing expedition," Lewis v. Ft. Collins, 903 F.2d at 759. The Court views a request to "explore" as an invitation to allow Duprey to conduct a fishing expedition.  Rather than explaining what evidence Duprey might possibly uncover that could create a genuine issue of material fact, Mr. Montoya's affidavit provides only a general indication that further discovery is needed.  Rule 56(f) requires more.

Accordingly, the Court finds that Mr. Montoya's affidavit fails to provide the requisite specificity.  The Court therefore declines to allow the requested discovery before ruling on the motion for summary judgment.  The Court will instead proceed to decide the issues raised in Hatcher and Park's motion.[2]

## II.   THE COURT WILL DISMISS ANY TITLE VII AND FEDERAL AGE DISCRIMINATION IN EMPLOYMENT ACT CLAIMS AGAINST PARK AND HATCHER.

Park and Hatcher assert that, under longstanding circuit precedent, the relief available under Title VII is available against employers, and not against supervisors and other employees.  See Memo. at 2.  See Haynes v. Williams, 88 F.3d 898, 899 (10th Cir. 1996)(" The relief granted under Title VII is against the employer, not individual employees whose actions would constitute a violation of the Act.").  The Defendants argue that the same applies to the claims against Hatcher

---

[2] If, of course, discovery discloses that the Court's assessments herein are incorrect, the parties remain free to ask the Court to reconsider on the basis of new evidence.

and Park for alleged violations of the Federal Age Discrimination in Employment Act.

In her response, Duprey conceded: "Plaintiff concurs that Counts I and III do sound against the entity employer only and do not present claims against individuals." Response at 1. The Court agrees that Hatcher and Park are not amenable to individual liability on Counts I and III of the Complaint. Accordingly, at the hearing, the Court agreed to dismiss the Title VII claim and the claim under the Federal Age Discrimination in Employment Act claim against Hatcher and Park.

## III.   PARK, IN HER ACTS IN RECORDING THE JUDICIAL GRIEVANCE BOARD PROCEEDINGS, WAS NOT ACTING IN A QUASI-JUDICIAL CAPACITY AND IS THEREFORE NOT ENTITLED TO ABSOLUTE IMMUNITY.

At the hearing, the Court indicated to the parties that its ruling on Park's immunity defense might turn on how the Court rules in the case of Defendant the Honorable Eugenio S. Mathis. See Tr. at 47:17-25 (Court). The Court ultimately held that Mathis was entitled to immunity because, as chairperson of the grievance board, his role was similar to that of a judicial officer or an administrative law judge in a quasi-judicial setting. After careful consideration, however the Court believes that, while Mathis was entitled to immunity, Park did not play a judicial or similar role that would entitle her to immunity.

To evaluate a claim of quasi-judicial immunity, the Tenth Circuit has articulated a test which states that, for an official at an administrative hearing to enjoy absolute immunity, "'(a) the officials' functions must be similar to those involved in the judicial process, (b) the officials' actions must be likely to result in damages lawsuits by disappointed parties, and (c) there must exist sufficient safeguards in the regulatory framework to control unconstitutional conduct.'" Guttman v. Khalsa, 446 F.3d at 1033 (quoting Horwitz v. State Bd. of Med. Examiners, 822 F.2d at 1513). In a previous Memorandum Opinion and Order, entered July 14, 2009 (Doc. 48)("July 14 MOO"), the Court stated that the grievance hearing was a quasi-judicial occurrence. The Court, in reaching its

conclusion, reasoned:

> The hearing that Duprey had in front of the grievance board resembles an administrative hearing in many respects. It was adversarial in nature, and involved the presentation of evidence and the examination of witnesses. At the hearing, the grievance board listened to evidence, including, presumably, evidence that Duprey was allowed to proffer in support of her contention that the demotion was improper. At the end of the proceeding, the grievance board had to make a determination. The grievance hearing was therefore judicial in nature.

Id. at 20. The Court also noted that the orderly fashion in which the grievance hearing had to be carried out, with parties being allowed to present opening statements, put on evidence, have rebuttal, and make closing statements, along with the deliberative manner in which the grievance board was to reach its decisions and release its findings in writing, contributed to the finding that the grievance hearing was a quasi-judicial affair. See id. at 20-22.

Despite its holding regarding Mathis' request for immunity, the Court believes Park's role, unlike Mathis', was not judicial in nature. Rather, as Duprey has correctly argued, Park played a ministerial, mechanical role in the grievance hearing for which immunity is not warranted. Thus, under the first prong of the test articulated in Guttman v. Khalsa, the distinction between Mathis' and Park's roles suggests that Park should not enjoy immunity.

The Tenth Circuit in Guttman v. Khalsa stated that, for quasi-judicial immunity to attach, "the officials' functions must be similar to those involved in the judicial process." 446 F.3d at 1033. This wording, broadly read, might encompass all participants in a judicial process, including non-discretionary support staff. The Court does not believe, however, that the Tenth Circuit intended to extend immunity to individuals who exercise no discretion in the judicial process.

In Guttman v. Khalsa, the Tenth Circuit cited and relied on an earlier case that established the principle that the State Board of Medical Examiners enjoyed immunity for quasi-judicial acts associated with disciplining or de-licensing doctors. That case was Horwitz v. State Bd. of Medical

Examiners of State of Colo., another Tenth Circuit case.  See Guttman v. Khalsa, 446 F.3d at 1027.

In turn, the Tenth Circuit in  Horwitz v. State Bd. of Medical Examiners of State of Colo. was

applying the rationale of  Butz v. Economou, 438 U.S. 478 (1978).

In Butz v. Economou, the Supreme Court held that "adjudication within a federal

administrative agency shares enough of the characteristics of the judicial process that those who

participate in such adjudication should be immune from suits for damages."  Butz v. Economou,

438 U.S. at 513.  The Supreme Court in Butz v. Economou reasoned that "conflicts which federal

hearing examiners seek to resolve are every bit as fractious as those which come to court," given

that, "[w]hen the controversy involves questions affecting large amounts of property or relates to

a matter of general public concern, or touches the interests of numerous parties, the disappointment

occasioned by an adverse decision, often finds vent in imputations of [malice]."  Id.  (quoting

Bradley v. Fisher, 80 U.S. 335, 348 (1871))(second alteration in Butz v. Economou).  The Supreme

Court also stated that the role of a federal hearing examiner or an administrative law judge was

"functionally comparable" to that of a judge.  Butz v. Economou, 438 U.S. at 513.  Moreover, the

administrative law judge's

> powers are often, if not generally, comparable to those of a trial judge: He may issue
> subpoenas, rule on proffers of evidence, regulate the course of the hearing, and make
> or recommend decisions. . . .  More importantly, the process of agency adjudication
> is currently structured so as to assure that the hearing examiner exercises his
> independent judgment on the evidence before him, free from pressures by the parties
> or other officials within the agency.

Butz v. Economou, 438 U.S. at 513.

The Tenth Circuit, in  Horwitz v. State Bd. of Medical Examiners of State of Colo.,

recognized that the rationale from Butz v. Economou applies in cases involving state administrative

and executive officials serving in adjudicative, judicial, or prosecutorial capacities.  See Horwitz v.

-31-

State Bd. of Medical Examiners of State of Colo., 822 F.2d at 1515.  The Tenth Circuit in Horwitz v. State Bd. of Medical Examiners of State of Colo. explained that it would be untenable to distinguish, for purposes of immunity law, between suits brought against state officials under 42 U.S.C. § 1983 and suits brought directly under the Constitution against federal officials.  See Horwitz v. State Bd. of Medical Examiners of State of Colo., 822 F.2d at 1515.

Unlike Mathis, who oversaw the grievance hearing and participated in the deliberative process that resulted in the final, unfavorable disposition, Park had no discretionary role.  She did not exercise independent judgment.  See Butz v. Economou, 438 U.S. at 513.  R. Gallagher, G. Hughes, T. Thomas, and D. Ytreberg, American Jurisprudence, Civil Rights § 105 (updated 2009) (stating that immunity extends "to officials other than judges when they perform quasi-judicial functions, that is, when their duties are functionally comparable to those of judges in that they, too, exercise discretionary judgment as part of their function.")(footnote omitted).  Park therefore does not need the protection of quasi-judicial immunity to assure that she is able to exercise independent judgment, unbiased and free from the pressures that potential civil liability might bring about.  The Supreme Court has explained that underlying the doctrine of judicial immunity is the notion that a judge must be able to exercise independent judgment without fear of being amenable to the losing party: "[I]t is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself." Bradley v. Fisher, 80 U.S. at 347.  An individual whose job at a judicial proceeding is to run a tape recorder is not one who needs to be able to act according to her own convictions.  Rather, Park's job at the grievance hearing was to follow the rule, set forth in the New Mexico Judicial Branch Personnel Rules, to make the recording.  The judicial immunity doctrine and its offshoot, the quasi-judicial immunity doctrine,

are not designed to protect such actors.  Park is therefore not immune from suit for the actions she took related to the grievance hearing, given that none of those actions were discretionary in nature.

There is a line of cases in the Tenth Circuit to the effect that non-judicial officers performing discretionary or ministerial acts are entitled to absolute quasi-judicial immunity under certain circumstances.  See Whitesel v. Sengenberger, 222 F.3d 861, 869 (10th Cir. 2000).  In Whitesel v. Sengenberger, a plaintiff brought suit against several pretrial services officers in the First Judicial District of Colorado, alleging that the officers violated his constitutional rights by issuing a temporary restraining order before he was afforded a hearing before a judge.  See 222 F.3d at 863. The Tenth Circuit affirmed the district court's granting immunity to the officers, explaining: "Although absolute immunity generally extends to non-judicial officers performing discretionary judicial acts, some circuits, including our own, have held that those performing ministerial acts at the direction of a judge are also entitled to absolute immunity."  Id. at 869.

In support of its decision, the Tenth Circuit reasoned that the officers "were acting pursuant to judicial directives and were expected to sign and deliver the TROs on the standard form approved by the First Judicial District.  Therefore, even if their actions could be characterized as ministerial, they would still be absolutely immune from civil suit."  Id. at 869-70.

Similarly, the Tenth Circuit held in an earlier case that officers who, upon the order of a court, detained an individual who had been held in contempt of court, were immune from suit for carrying out the Court's order.  See Valdez v. City and County of Denver, 878 F.2d 1285, 1290 (10th Cir. 1989).  In Valdez v. City and County of Denver, the plaintiff had been present as a spectator in state traffic court.  At some point, the Denver County Court Judge presiding over the proceedings "said something to a defendant with which [the plaintiff] disagreed."  Id. at 1286.  As a result of his disagreement, the plaintiff exclaimed "bullshit" and had an exchange of words with

the judge.  Id.  The judge held the plaintiff in contempt and ordered one of the defendants, a police

officer, to arrest the plaintiff.  See id.  The officer complied, and, later the same day, the judge issued

a mittimus directing the municipality to retain custody of the plaintiff.  See id.  Pursuant to the

judge's order, the plaintiff was incarcerated for two weeks under the administrative supervision of

another defendant.  See id.

The Tenth Circuit, in holding that the arresting officer and the defendant who was the

administrative supervisor of the jail where the plaintiff was held were entitled to absolute immunity,

reasoned:

> To force officials performing ministerial acts intimately related to the judicial
> process to answer in court every time a litigant believes the judge acted improperly
> is unacceptable.  Officials must not be called upon to answer for the legality of
> decisions which they are powerless to control. We explained in [T & W Inv. Co., Inc.
> v.] Kurtz, 588 F.2d [801,] at 802 (10th Cir. 1978), that it is simply unfair to spare the
> judges who give orders while punishing the officers who obey them. Denying these
> officials absolute immunity for their acts would make them a "lightning rod for
> harassing litigation aimed at judicial orders."  Id.  And such suits, the large portion
> of which would be frivolous, would be certain to arise repeatedly.

Valdez v. City and County of Denver, 878 at 1288 (footnote omitted).

Despite this line of cases affording judicial officers immunity for performing ministerial

tasks under court order, the Court believes there is other precedent that is more recent and more on

point for the circumstances of this case.  The Supreme Court, subsequent to the Tenth Circuit's

holdings in Whitesel v. Sengenberger and in Valdez v. City and County of Denver, found that court

reporters do not enjoy absolute immunity from suit.  See Antoine v. Byers & Anderson, Inc., 508

U.S. at 435-36.  The Supreme Court's rationale for reaching such a conclusion was that court

reporters perform "ministerial, not discretionary" duties.  Id. at 436 (citations and internal quotation

marks omitted).  The Court believes the reasoning from Antoine v. Byers & Anderson, Inc. applies

to this case.

-34-

Although Park was not a professional court reporter at the grievance hearing, she was the functional equivalent of one – her job was to attend to the mechanical, non-discretionary task of making a taped recording of the grievance hearing.  Although her task did not require a court reporter's skill, it served the same end – to comply with the requirement that a verbatim record be available of the hearing.  If a court reporter does not receive immunity, neither does someone tasked with making the audio, as opposed to the written, record of a hearing.

The Court also notes that there is support in Tenth Circuit case law for the proposition that court reporters can be sued under 42 U.S.C. § 1983.  For example, "[s]ome courts have recognized § 1983 claims based on allegations that a court reporter altered criminal trial transcripts." Brown v. New Mexico Dist. Court Clerks, 141 F.3d 1184, *2 (10th Cir. 1998)(table)(gathering cases). Because it could not conclude that it was patently obvious that a pro se plaintiff would not be able to prevail on his civil rights claim against a court reporter for allegedly altering a transcript, the Tenth Circuit reversed a district court's sua sponte dismissal of the plaintiff's claim.  See id.

There is good reason to distinguish Park's situation from ministerial officers or employees who have received immunity from suit.  In the relevant case law, the individuals receiving immunity were acting under the direction of a court order or an instruction from a judge.  The defendants in Valdez v. City and County of Denver detained the plaintiff when a judge ordered them to do so.  See 878 F.2d at 1286.  The cases upon which the Tenth Circuit relied in Valdez v. City and County of Denver are similar.

The Tenth Circuit in  Valdez v. City and County of Denver relied on T & W Inv. Co., Inc. v. Kurtz, 588 F.2d 801, 802-03 (10th Cir. 1978)(holding that a receiver named as a defendant in a corporation's civil rights suit was a court officer entitled to immunity to the extent he carried out the orders of his appointing judge); Coverdell v. Department of Social and Health Serv., 834 F.2d

758, 764-65 (9th Cir. 1987)(holding that a social worker who apprehends a child pursuant to a court order is entitled to absolute quasi-judicial immunity);  Henry v. Farmer City State Bank, 808 F.2d 1228, 1238-39 (7th Cir. 1986) (finding that a sheriff acting pursuant to a court order directing enforcement of a judgment was entitled to absolute immunity for allegedly wrongful conduct); Property Management & Invs., Inc. v. Lewis, 752 F.2d 599, 602-04 (11th Cir. 1985)(holding that the receiver of a corporation who was carrying out the orders of the appointing judge was entitled to immunity from suit);  Tymiak v. Omodt, 676 F.2d 306, 308 (8th Cir. 1982)(affording immunity to a sheriff who, pursuant to a court order, evicted a plaintiff from home);  Tarter v. Hury, 646 F.2d 1010, 1013 (5th Cir. 1981)(granting clerks of court immunity from suit for damages based on ministerial activities required by court order); Slotnick v. Garfinkle, 632 F.2d 163, 166 (1st Cir. 1980)(holding that a court clerk and a state hospital superintendent acting on a judge's orders were entitled to immunity); Waits v. McGowan, 516 F.2d 203, 206 & n.6 (3d Cir. 1975)(concluding that police officers carrying out ministerial functions under a court's direction received immunity); Fowler v. Alexander, 478 F.2d 694, 696 (4th Cir. 1973)(finding that a sheriff and a jailer who confined an individual pursuant to a court order were absolutely immune from suit); and Bradford Audio Corp. v. Pious, 392 F.2d 67, 72-73 (2d Cir. 1968)(holding that a court-appointed receiver enforcing a court order was immune from suit).

The extensive case law on the subject of immunity for ministerial functions illuminates that the immunity flows from the judge's immunity.  Actors who are doing the judge's bidding should not be held liable in a civil rights suit where the order they were implementing came from the bench, given that they are not making the allegedly bad call and have no authority to do so.  For Park to receive such immunity, the record should therefore reflect that Park carried out the alleged wrongful act (i.e., spoiling the record of the grievance hearing) under an order from the grievance board.

There are no allegations that such circumstances exist in this case. Rather, like a Court reporter, Park's job at the hearing was to make the record – she was not ordered to stop the tape recorder or to do anything else that would prevent a record from being made.

Thus, because Park's activities relating to the lost recording were analogous to those of a court reporter, the Court believes <u>Antoine v. Byers & Anderson, Inc.</u> is the most applicable authority on Park's immunity claim. Accordingly, the Court concludes that Park is amenable to suit under § 1983, that she does not enjoy absolute immunity for her court-reporter-like function, and that she is therefore not entitled to dismissal on immunity grounds.[3]

## IV. HATCHER AND PARK CAN BE HELD INDIVIDUALLY LIABLE UNDER THE NMHRA.

Hatcher and Park contend that they cannot be held individually liable under the NMHRA because they did not act for Duprey's employer. The Court disagrees. Hatcher and Park rely on an overly cramped construction of what it means to "act for the employer." Based on the language of the NMHRA and on New Mexico case law interpreting that language, the Court concludes that

---

[3] The Court is not opining in any way whether Duprey's claim against Park will be successful. To be liable under § 1983 for due-process violations, a defendant must have intentionally violated the plaintiff's constitutional rights; negligence will not suffice. See, e.g., Daniels v. Williams, 474 U.S. 327, 328 (1986)("We conclude that the Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property."); Mills v. Conners, 319 Fed.Appx. 747, 749 (10th Cir. 2009)("It is well-established that mere negligence cannot support § 1983 claims that are premised on the denial of due process or of access to the courts."); Simkins v. Bruce, 406 F.3d 1239, 1242 (10th Cir. 2005) (holding that "when access to courts is impeded by mere negligence, . . . no constitutional violation occurs"). Here, Duprey has alleged that Park acted with more than negligence regarding the lost audio. In the Complaint, for example, Duprey puts the word "accidentally" in quotation marks when discussing the destruction of the audio, and alleges that there was no technical explanation for the alleged malfunction. See Complaint ¶¶ 53-54, at 12. The insinuation that Duprey wishes to make by framing her Complaint in such a way is that Park intentionally spoiled the tape. Whether there is any evidence of intentional action is not at issue on this motion. At this time, the Court decides whether Park is entitled to immunity, but does not decide whether there is evidence that she acted with more than negligence.

Hatcher and Park acted for Duprey's employer and are consequently amenable to suits as individuals under the NMHRA.

## A.   NEW MEXICO COURTS HAVE INDICATED THAT INDIVIDUALS CAN BE SUED UNDER THE NMHRA IN THE PROPER CIRCUMSTANCES.

The NMHRA defines "employer" as "any person employing four or more persons and any person acting for an employer."  NMSA 1978 § 28-1-2B.  Given this language, the Supreme Court of New Mexico has recognized that individual liability might exist against certain actors under the NMHRA.  Discussing the possibility, the Supreme Court of New Mexico in Sonntag v. Shaw noted:

> [T]his Court has acknowledged the possibility of individual liability for discrimination claims. Cf. Luboyeski v. Hill, 117 N.M. 380, 382, 872 P.2d 353, 355 (1994) (affirming the dismissal of individual defendants because the plaintiff failed to exhaust administrative remedies against them); Mitchell-Carr v. McLendon, 1999-NMSC-025, ¶ 10, 127 N.M. 282, 980 P.2d 65 (citing Luboyeski).  As Plaintiff suggests, the potential for individual liability for discrimination claims is rooted in the language of the NMHRA itself, which forbids "any person" from supporting a discriminatory practice.  Section 28-1-7(I); see NMSA 1978, § 28-1-2(A) (1993) (including within its definition of "person" for purposes of the NMHRA, "one or more individuals").

Sonntag v. Shaw, 130 N.M. at 243, 22 P.3d at 1193.  This Court has also dealt with situations where plaintiffs have attempted to subject an individual to liability under the NMHRA.  Similar to what happened in Luboyeski v. Hill, this Court in Vigil v. City of Espanola considered whether it should preclude a plaintiff from naming an individual in a suit under the NMHRA because the plaintiff failed to exhaust administrative remedies.  See 2009 WL 1300746, at *1 (D.N.M.).  The Court in Vigil v. City of Espanola was able to dispose of the issues in the case without deciding that issue, finding that regardless whether the plaintiff had exhausted her administrative remedies against the individual, her NMHRA claims were time-barred.  See id. at *15.

Although the Court in Vigil v. City of Espanola did not decide whether an individual can be sued under the NMHRA, the Court assumed, without deciding, that an individual properly named

as a respondent in the administrative process, could be sued.  See id. *14.  Furthermore, in an earlier

case, this Court acknowledged: "As the Supreme Court of New Mexico has held, 'individual

defendants cannot be sued in [New Mexico state] district court under the [New Mexico] Human

Rights Act unless and until the complainant exhausts her administrative remedies against them.'"

Kelley v. City of Albuquerque, 375 F.Supp.2d 1183, 1214 (quoting Luboyeski v. Hill, 117 N.M. at

382, 872 P.2d at 355)(alterations in Kelley v. City of Albuquerque).  In other words, the Court has

implicitly recognized that plaintiffs can bring NMHRA suits against individuals under the

appropriate circumstances.  The Court's conclusion that individuals can, at times, be subject to suit

under the NMHRA is therefore consistent with what the Supreme Court of New Mexico has done

in the past.  It is also consistent with what this Court has done.

**B.     HATCHER AND PARK ACTED FOR DUPREY'S EMPLOYER.**

For an individual to be liable under the NMHRA, the individual must meet the NMHRA's

definition of employer.  Thus, the individual must have "acted for" the employer.  NMSA 1978 §

28-1-2B.  In this case, the Court finds that Hatcher and Park acted for the employer, as understood

in the NMHRA.

The first step to sorting out whether Hatcher and Park acted for the employer is to determine

who the employer is.  Duprey's employer is the Twelfth Judicial District.  Hatcher and Park,

however, are employed by the Administrative Office of the Courts, which provides certain

administrative support services to the courts of New Mexico.  See NMSA 1978 § 34-6-19, and

NMSA 1978 § 34-9-6.  According to the Defendants, because Hatcher and Park did not have

authority, as employees of the Administrative Office of the Courts, to make decisions that would

impact Duprey's employment relationship with the Twelfth Judicial District, they could not have

acted for the Twelfth Judicial District.  This argument ignores the practical reality of what happened.

It is important to note that the state statute does not require the individual defendant to be an employee of the corporation or entity, but to have "acted for" the employer.  Such language suggests that a contractor or agent, who acts on behalf of a corporation of entity, could be held individually liable under the NMHRA.  The Administrative Office of the Courts is a creature of statute, and its Human Resource Division handles employee relations, and, as this case illustrates, involves itself in disciplinary matters.  For example, in this case, the Administrative Office of the Courts handled the grievance investigation and set up the grievance hearing.  See March 5 Letter at 1.  Thus, the activities for which Hatcher and Park were sued, were carried out pursuant to the Administrative Office of the Court's employee relations function for the judicial branch.  Hatcher and Park were not setting up a grievance hearing or conducting a grievance investigation to deal with relations between Duprey and the Administrative Office of the Courts.  Instead, they were conducting those activities to deal with the relationship between Duprey and her employer – the Twelfth Judicial District.  Thus, it is a stretch to argue that individuals from the Human Resources Division of the Administrative Office of the Courts participating in employee-relations disputes, and in proceedings that ultimately resulted in an employee being subject to disciplinary action did not act for the employer here.

To further illustrate the relationship of the Administrative Offices of the Court with the New Mexico judiciary, the Supreme Court of New Mexico appoints the director of the Administrative Office of the Courts, who is able to appoint employees at the approval of the Supreme Court of New Mexico.  See NMSA 1978 § 34-9-1, 2.  The Administrative Office of the Courts is responsible for the administration of funds for the court automation fund, the jury- and witness-fee fund, the municipal-court automation fund, the magistrate- and metropolitan-court capital fund, the court-facilities fund, the consolidation-study committee, and the judicial-performance evaluation fund.

See id. § 34-9-10-14, 17-18.

Under the direction and supervision of the Supreme Court, the director of the Administrative Office of the Courts is in charge of supervising all matters relating to the administration of the courts.  See id. § 34-9-3A.  Among the duties related to the administration of the courts is to examine the fiscal matters, manage the courts' finances, and ensure that there is adequate and equitable financing of the courts.  See id. § 34-9-3B and D.  To manage the courts' finances, the director receives proposed budgets from the courts and makes adjustments to them before submitting them to the state budget division of the department of finance and administration.  See id. § 34-9-3D. Additionally, the director has the responsibility of examining the courts' dockets and compiling a report to submit to the legislature every January that includes statistical data regarding the business of the courts.  See id. § 34-9-3B-C.  The Administrative Office of the Courts also compiles manuals detailing the requirements for uniform system of records and forms to be used by the courts.  This manual must be approved by the Supreme Court of New Mexico, filed with the Supreme Court librarian, and reproduced by the Administrative Office of the Courts.  Any manual produced according to this procedure is effectively law and functions as a set of rules of the Supreme Court. See id. § 34-9-8A.

In other words, the Administrative Office of the Courts is, as its name suggests, the entity responsible for handling the administrative aspects of the judicial branch.  The Administrative Office of the Courts is responsible for facilitating the functioning of New Mexico's courts by managing finances, resources, and communications.  An important part of the Administrative Office of the Courts' duties is to maintain a statewide human-resources system.  See New Mexico Administrative Office of the Courts, Administrative Office of the Courts – A.C., http://www.nmcourts.gov/newface/aoc/index.html (last visited July 15, 2009).

Acting in her position as Director of the Human Resource Division of the Administrative Office of the Courts, Hatcher tasked Park, a subordinate employee at the Administrative Office of the Courts, with attending to the logistics of the grievance hearing.  See Duprey Aff. ¶ 6, at 2.  The Administrative Office of the Courts, through Park, also oversaw the internal-grievance investigation into hostile work environment that Duprey requested.  See March 5 Letter at 1 & 5.  In other words, the Administrative Office of the Court acted for the Twelfth Judicial District in administering the grievance hearing and the grievance investigation, while Hatcher and Park acted for their employer, the Administrative Office of the Court, in performing the leg work for those proceedings.  Thus, to say that Hatcher and Park did not "act for" the Twelfth Judicial District would require the Court to disregard the Administrative Office of the Court's role and relationship with the Twelfth Judicial District, in addition to Hatcher's and Park's role in the Administration Office of the Court.

Given that the Administrative Office of the Court handles personnel matters, including the grievance investigations and the logistics of the grievance proceedings, for the Twelfth Judicial district, it makes sense to say that  individuals from the Administrative Office of the Courts act for the Twelfth Judicial District.  Accordingly, the Court believes Hatcher and Park acted for the Twelfth Judicial District.  Because the acted for the Twelfth Judicial District, they may be subject to individual suit under the NMHRA.

## V.     PARK DID NOT TAKE ANY ACTION THAT RESULTED IN A DEPRIVATION OF DUPREY'S RIGHT TO DUE PROCESS.

Duprey's due-process claims against Park arise out of Park's losing the record to the first day of the grievance hearing, and Park's allegedly incompetent and biased handling of the logistics of the grievance hearing and of the grievance investigation.  None of the acts that Park committed, however, give rise to due-process violations.  The Court will therefore dismiss the due-process

claims against Park.

"To set forth an actionable procedural due-process claim, a plaintiff must demonstrate: (1) the deprivation of a liberty or property interest and (2) that no due process of law was afforded." Ripley v. Wyoming Medical Center, Inc., 559 F.3d at 1122 (citations and internal quotation marks omitted).  The Supreme Court has described "the root requirement of the Due Process Clause as being that an individual be given an opportunity for a hearing before he is deprived of any significant property interest."   Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542 (1985)(internal quotation marks and citations omitted).

###   A.   PARK'S ACTS RELATED TO THE GRIEVANCE HEARING DO NOT GIVE RISE TO A DUE-PROCESS CLAIM.

Regarding allegations stemming from the grievance hearing, the property interest of which Duprey was deprived is her employment.  More specifically, she was demoted from her supervisory position, and the result of the grievance hearing was to finalize that demotion.  Thus, Duprey has shown that she meets the first part of the test for a procedural-due process claim.  It is at the second part of the test, however, where her procedural-due process claim loses steam, because, before the deprivations, Duprey received a relatively elaborate process that satisfied constitutional requirements.  Duprey was afforded, as the constitution requires, "an opportunity for a hearing before [being] deprived of any significant property interest." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542.

In her affidavit, Duprey states: "I requested a grievance hearing under the NMJBPR 10 [New Mexico Judicial Branch Personnel Rule 10] on October 2, 2007."  Duprey Aff. ¶ 5, at 2.  Duprey does not dispute that the grievance hearing occurred, pursuant to her request, on November 16, 2007 and December 5, 2007.  Park's involvement in that hearing was to oversee setting it up – something

her supervisor Hatcher tasked her with doing.  See id.  There is no evidence in the record that Park played a role in making any substantive decisions at the grievance hearing.  That Duprey received a two-day hearing, with opportunity to be represented by counsel, put on evidence, and question witnesses, is fatal to any procedural-due process claim rising out of the demotion.

A recent Tenth Circuit case illustrates the failing of Duprey's procedural-due process claim arising out of her demotion.  In Lee v. Regents of University of California, 221 Fed. Appx. 711 (10th Cir. 2007), the Tenth Circuit affirmed a district court's order granting qualified immunity to a set of defendants who had been sued after taking part in a series of events culminating in the termination of an individual's employment at Los Alamos National Laboratory.  See 221 Fed.Appx. at 715.  The plaintiff in Lee v. Regents of University of California alleged in his complaint that a probationary employee under his supervision had complained that the plaintiff was treating her unfairly.  See id. at 712.  Encouraged by a fellow staff member, the probationary employee took her complaints to a high-level manager and explained that she was being mistreated and wanted a job transfer.  See id.  The manager, "acting in concert" with the human relations office, opened an investigation into the probationary employee's complaints.  Id.  The plaintiff alleged in his complaint that "the investigation was unfair, inadequate, biased, and not calculated to yield reliable results, and was instead designed to gather sufficient adverse material concerning [him] to provide a pretextual basis for disciplining him."  Id. (internal quotation marks and citations omitted).  At the same time, he conceded that he had been interviewed twice as part of the investigation into the complaints against him.   See id. Subsequently, in a meeting between the manager, the individual from the human relations office, and the plaintiff's department group leader, the plaintiff was suspended and demoted.  See id.  Two months later, he was terminated.  See id.

The Tenth Circuit in Lee v. Regents of University of California praised the district court's

analysis as "a thorough and well-reasoned opinion," 221 Fed.Appx. at 713, and cited highlights of

that analysis, which found that the plaintiff had failed to allege a valid procedural-due process claim

for his termination, see id.  Notably, the Tenth Circuit, describing the district court's analysis, stated

that the district court

> found that even if Lee had challenged the adequacy of the termination process, his
> § 1983 claim would still have failed because it was evident from the complaint that
> [the plaintiff] was accorded adequate process.  Citing <u>Cleveland Board of Education
> v. Loudermill</u> . . . , the [district] court explained that "[a] pretermination hearing
> 'need not be elaborate' nor does it need to be a full-blown evidentiary hearing. . . .
> All that due process requires is 'notice and an opportunity to respond.'" Aplt.App.
> at 59-60.  Here, the court determined that McCabe's pre-termination interviews of
> [the plaintiff] showed that he was provided with notice and an opportunity to
> respond, which was all that due process required.

<u>Lee v. Regents of University of California</u>, 221 Fed.Appx. at 713 (first alteration added).  Thus, the

Tenth Circuit agreed that the two occasions on which the plaintiff was interviewed were all that due-

process required to put him on notice and allow him to respond before termination.  No elaborate

proceeding was required.

Duprey received more extensive protections before her demotion was finalized than the

plaintiff in <u>Lee v. Regents of University of California</u>, whose claim was dismissed.  The New

Mexico Judicial Branch Personnel Rules establish the purpose of the grievance board: "To provide

an administrative appeal process for an employee who has completed probation and who has been

suspended without pay, demoted, terminated or lost compensation."  New Mexico Judicial Branch

Personnel Rules § 10.01, at 47.  When an Duprey filed her grievance to appeal her demotion, the

rules provided that she would "be free from any restraint, interference, coercion, discrimination

and/or retaliation resulting from filing the grievance."  <u>Id.</u> § 10.04, at 48.  The Honorable Eugenio

Mathis, the chairperson and named co-Defendant, was required to conduct the hearing and

administer oaths to all witnesses.  <u>See id.</u> § 10.07(A), at 49.  Furthermore, the rules require that the

hearing be recorded.  See id., § 10.07(C), at 49.  Moreover, to further establish the judicial character

of the proceedings, the rules require:

D.      The hearing shall be conducted in an orderly and informal manner without strict adherence to The New Mexico Rules of Evidence.  The *Administrative Authority* shall have the burden of proof by a preponderance of the evidence.

E.      The order of the hearing shall be:

(1)      opening statements:

a.        by *Administrative Authority*

b.        by Grievant

2.        presentation of case:

a.        by *Administrative Authority*

b.        by Grievant

3.        rebuttal and surrebuttal

4.        closing statements:

a.        by *Administrative Authority*

b.        by Grievant

Id. §§ 10.07(D) to 10.07(E), at 49-50 (italics in original).

Duprey emphasizes the informal nature of the proceeding.  Indeed, the New Mexico Judicial

Branch Personnel Rules use the phrase "informal" to describe the proceedings.  Nevertheless, the

Court believes the primary point of referring to the proceeding as informal is to underscore that

parties need not strictly adhere to the rules of evidence.  The rules, however, required that the

grievance hearing be conducted in an orderly fashion, with parties being allowed to take their turn

making opening arguments, putting on a case, and making closing statements.  Witnesses are placed

under oath.  Thus, the format of the grievance hearing contains numerous built-in procedural rights

for individuals who face adverse employment actions such as demotions.  A grievance hearing to which New Mexico Judicial Branch employees are entitled before adverse employment actions become final goes beyond what Tenth Circuit law establishes as a constitutional minimum for procedural due-process.

Moreover, to reach a decision, the grievance board "shall retire into an *executive session* to deliberate" and "shall issue its written decision . . . ."  Id. § 10.08, at 50 (italics in original).  This deliberative process indicates that the process in place for aggrieved employees also included deliberative decisionmaking by a panel with members drawn from different backgrounds to further assure fairness and impartiality.  The fruit of the deliberation is a written decision that contains findings of fact, and either an order for remedial action or denial of the grievance.

The Court therefore believes that dismissal of Duprey's procedural-due process claim for the events leading to her demotion is consistent with the Tenth Circuit's discussion in Lee v Regents of University of California.  Duprey got her opportunity to be heard at a complex grievance hearing, with an attorney and with an opportunity to question witnesses and make opening and closing arguments to a panel of decision-makers.  That grievance hearing constituted due process.

Duprey alleges, however, that Park failed to assure an unbiased grievance hearing free from conflicts of interests.  In her affidavit, for example, Duprey states: "I had an expectation that this grievance board would be individuals who did not know me, had never had an opportunity to meet me and had no predisposition about me.  I do not think that was done and I do not believe it was a fair and impartial panel."  Duprey Aff. ¶ 5, at 2.  Duprey places part of the blame for these alleged failings on Hatcher, as a director of the Administrative Office of the Court, and some of the blame on Park.  See id.  Although she does not say so explicitly, it appears, from these allegations, that Duprey is essentially arguing that, even though there was a procedure, that procedure did not afford

-47-

her due-process because it was inherently biased against her.  In other words, it was futile for her to pursue those avenues.

The Tenth Circuit has held that a plaintiff alleging due-process violations for adverse employment decisions fails to state a claim for biased pre-deprivation proceedings if the plaintiff fails to avail himself of available post-deprivation procedures.  See Lee v. Regents of University of California, 221 Fed.Appx. at 714.  The plaintiff in Lee v. Regents of University of California argued that the procedures in place for laboratory employees such as him, who were subject to termination, were so biased in favor of the laboratory that the employees should not be required to participate in them to raise a procedural due-process claim.  See id.  Rejecting that argument, the Tenth Circuit explained:

> We also agree with the district court that [the plaintiff] waived any challenge to the fairness of the Lab's post-termination hearing procedures because he never requested a post-termination hearing.  And as the district court stated, he cannot make a futility argument with respect to the post-termination process based on alleged unfairness in the pre-termination process.  See Alvin [v. Suzuki], 227 F.3d [107,] 119 [(3d Cir. 2000)] (explaining that bias in early stages of termination process does not prove bias in later stages).

Lee v. Regents of University of California, 221 Fed.Appx. at 714.

The Tenth Circuit in Lee v. Regents of University of California relied on Alvin v. Suzuki, a Third Circuit case, in its futility analysis.  The Third Circuit, in Alvin v. Suzuki, discussed cases "in which plaintiffs have attempted to make a procedural due process claim, charging that bias has infected a review of its deprivation, although they have not used all of the procedures available to them."  227 F.3d at 118.  In such cases, the Third Circuit stated:

> [A] discharged employee cannot claim in federal court that he has been denied due process because his pretermination hearing was held by a biased individual where he has not taken advantage of his right to a post-deprivation hearing before an impartial tribunal that can rectify any possible wrong committed by the initial decisionmaker.

Id. at 119 (internal quotation marks and citations omitted).  The Third Circuit further explained that

an employee fails to state a claim for procedural-due process after pursuing a three-level, apparently

biased, grievance procedure, if the plaintiff fails to request arbitration when arbitration is available.

See id.   The Third Circuit reasoned that such a failure to pursue an available arbitration precluded

a due-process challenge "even when the plaintiff allege[d] that the defendants acted in concert to

deprive him both of a meaningful hearing and of arbitration because the administrative process in

place ha[d] incorporated safeguards adequate to resolve these allegations in a manner consistent with

the demands of due process."  Id. (internal quotation marks and citations omitted).

In this case, Duprey had access to a post-deprivation proceeding.  Rule 1-075(B) of the Rules

of Civil Procedure for the District Courts of New Mexico, provides:

> An aggrieved party may seek review of a final decision or order of an agency by (1)
> filing a petition for writ of certiorari in the district court with proof of service; and
> (2) promptly filing with the agency a copy of the petition for writ of certiorari that
> has been endorsed by the clerk of the district court.

NMRA 1-075 (2002).  The Court has previously held that, under rule 1-075(B), Duprey had the

opportunity to pursue a petition for certiorari in the district court.  The Court explained:

> Rule 1-075 allows parties to seek the writ to review final decisions by an "agency,"
> and defines agency as "any state or local government administrative or quasi-judicial
> entity."  NMRA 1-075 (A).  On its face, rule 1-075 applies only to government
> administrative or quasi-judicial entities.  New Mexico case law supports the
> proposition that the grievance board would constitute  an administrative or quasi-
> judicial body whose decisions could be reviewed pursuant to a writ of certiorari to
> a district court.

July 14 MOO at 25.

Although there is no case law that explicitly states that a right to petition for certiorari is

considered a post-deprivation remedy, the Court believes there is no sound reason for finding

otherwise.  In at least one other procedural-due process case arising out of the public-employment

context, the Tenth Circuit stated that a teacher whose employment was terminated had, in a fashion

similar to the plaintiff in Lee v. Regents of University of Cal., waived the right to challenge the

adequacy of certain procedural rights "by knowingly failing to take advantage of those procedures."

Pitts v. Board of Educ. of U.S.D. 305, Salina, Kansas, 869 F.2d 555, 557 (10th Cir. 1998).

According to the Tenth Circuit, teachers facing termination enjoyed various rights under Kansas

law:

> The Kansas procedures require notice of the reasons for the nonrenewal, allow an
> opportunity to be heard before termination, and give the teacher a right to choose a
> member of the hearing committee . . . .  In addition, the statute gives teachers the
> right to be represented by counsel . . . , to present and cross-examine witnesses . . .
> , and to subpoena witnesses . . . .  If the hearing committee unanimously finds in the
> teacher's favor, the board is required to adopt its decision . . . .  If the committee is
> not unanimous, the board is required to consider the committee's decision, hear oral
> argument or receive written briefs, and decide whether the teacher should be
> renewed or terminated . . . .  The board's decision may be appealed to district court
> . . . , which may receive new evidence and reverse, vacate, or modify the board's
> decision . . . .

Id. at 557 n.1 (citations omitted).  In other words, the Tenth Circuit in Pitts v. Board of Educ. of

U.S.D. 305, Salina, Kansas acknowledged that the ability to appeal a board's decision to a district

court was part of the package of post-deprivation procedures that would figure into the due-process

calculus.  If an appeal to a district court is considered a post-deprivation remedy, the Court believes

a right to seek certiorari to a district court should also be considered a post-deprivation remedy.

Both a right to an appeal and a right to petition for certiorari consist of an individual seeking review

of an unfavorable result from an internal hearing by going outside the organization to the district

court.  While a writ of certiorari is discretionary, and the appeal discussed in Pitts v. Board of Educ.

of U.S.D. 305, Salina, Kansas appears to have been as of right, such a distinction does not deprive

the right to certiorari of its character as an opportunity for judicial review to protect against

miscarriages of justice.  Accordingly, the Court believes it is proper to consider a right to petition

for certiorari in the district court to be a post-deprivation hearing.

There is no contention that Duprey filed a petition for certiorari.  Thus, Duprey declined to pursue an important post-deprivation procedure that was available to individuals such as her, who obtained unfavorable results before the grievance board.  A petition for certiorari would have allowed the state district court the opportunity to grant complete judicial review of what happened at the grievance committee, including whether that committee was biased or contained conflicts of interests.

The Court is cognizant that the Tenth Circuit's holding in <u>Lee v. Regents Of University of Cal.</u> and its reliance in that case on the Third Circuit's <u>Alvin v. Suzuki</u> has the appearance of an exhaustion requirement – something that is not normally a part of § 1983 cases.  In explaining that exhaustion was not the issue in  <u>Lee v. Regents Of University of Cal.</u>, the Tenth Circuit stated:

> [The plaintiff's] § 1983 claim fails not because he refused to jump through the requisite hoops, but because he affirmatively pled that he was afforded notice and an opportunity to respond before he was terminated. We also agree with the district court that Lee waived any challenge to the fairness of the Lab's post-termination hearing procedures because he never requested a post-termination hearing. And as the district court stated, he cannot make a futility argument with respect to the post-termination process based on alleged unfairness in the pre-termination process. <u>See</u> <u>Alvin</u>, 227 F.3d at 119 (explaining that bias in early stages of termination process does not prove bias in later stages).

<u>Lee v. Regents Of University of Cal.</u>, 221 Fed.Appx. at 714.  Similarly, this case is not about exhaustion.  To precisely state what the Court holds: First, Duprey received the requisite due process because she had notice and an opportunity to respond.  Second, she cannot properly challenge the fairness of the available post-deprivation procedure – in this case, a petition for certiorari – by making allegations that the proceedings through which she had already gone were biased.  Third, she waived the ability only to challenge the fairness of the available post-deprivation proceeding because she did not request such a proceeding.  She did not, by failing to pursue a petition for

certiorari, lose the ability to state a claim for due-process violations in general.

Thus, while the Court does not hold that there was an exhaustion requirement, the Court believes the Tenth Circuit has indicated that a plaintiff must first pursue a post-deprivation proceeding if she wants to challenged the fairness of that proceeding. Duprey did not do so in this case. Duprey has not otherwise shown that the pre-deprivation proceedings she suffered were constitutionally deficient, given that she had notice and an opportunity to respond.

In other words, even if Duprey argues that a petition for certiorari would be futile because it would require her to seek review with judges on the district court, some of whom might be biased against her, she cannot state a procedural-due process claim on such allegations unless she first petitions for certiorari. As the Tenth Circuit has explained, Duprey "cannot make a futility argument with respect to the post-termination process based on alleged unfairness in the pre-termination process." Lee v. Regents of University of California, 221 Fed.Appx. at 714.

This is not to say that having a biased judge or hearing officer can never amount to a constitutional violation, or that notice and an opportunity to respond in the face of obviously biased decision-makers is, nevertheless, all that due process requires. Recently, the Supreme Court reaffirmed the proposition that, in rare cases, the Constitution requires a judge's recusal. See Caperton v. A.T. Massey Coal Co., Inc., 129 S.Ct. at 2265. Caperton v. A.T. Massey Coal Co., Inc. arose out of the Supreme Court of Appeals of West Virginia's reversal of a trial-court judgment that had reflected a jury verdict of $50 million dollars against A.T. Massey Coal Co., Inc. ("Massey") for fraudulent misrepresentation, concealment, and tortious interference with existing contractual relations. See id. at 2257. A five-justice panel heard the appeal, and reversed the trial-court judgment 3-2 after one of the justices in the majority denied a recusal motion. See id. at 2256.

The motion to recuse was based on one of the justices having received substantial

contributions from Massey's chairman, chief executive officer, and president for his previous re-election campaign.  See id.  As the Supreme Court noted, Massey's CEO provided approximately $3 million, which constituted more than the total amount spent by the judge's other supporters and three times the amount spent by the judge's own committee.  See id. at 2257.  Massey's CEO was, in effect, the judge's largest financial contributor.  The plaintiff filed a motion to recuse based on the CEO's campaign activity for the judge, and the judge denied the motion.  See id. at 2257-58.

Noting that there are instances where "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable," id. at 2260 (internal quotation marks and citations omitted), the Supreme Court held that "[o]n these extreme facts the probability of actual bias rises to an unconstitutional level."  Id. at 2265.  To reach its holding in what it characterized as an extreme case, the Supreme Court applied an objective standard to determine whether the probability of actual bias was unconstitutionally high.  Under that standard, the Supreme Court asked whether, "under a realistic appraisal of psychological tendencies and human weakness, the interest poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented."  Id. at 2263 (internal quotation marks and citations omitted).

To support its conclusion under the objective standard, the Supreme Court reasoned:

[CEO] Blankenship's campaign efforts had a significant and disproportionate influence in placing Justice Benjamin on the case.  Blankenship contributed some $3 million to unseat the incumbent and replace him with Benjamin. His contributions eclipsed the total amount spent by all other Benjamin supporters and exceeded by 300% the amount spent by Benjamin's campaign committee.

Id. at 2264.  Moreover, the "temporal relationship between the campaign contributions, the justice's election, and the pendency of the case is also critical.  It was reasonably foreseeable, when the campaign contributions were made, that the pending case would be before the newly elected

justice." Id. at 2264-65.  Given those facts, the Supreme Court concluded that there was a

> serious risk of actual bias – based on objective and reasonable perceptions – when
> a person with a personal stake in a particular case had a significant and
> disproportionate influence in placing the judge on the case by raising funds or
> directing the judge's election campaign when the case was pending or imminent.

Id. at 2263-64.

The Supreme Court noted that Caperton v. A.T. Massey Coal Co., Inc., along with the few

other Supreme Court cases where the risk of a judge's bias became unconstitutionally high, arose

out of extreme facts.  See id. at 2265.  The cases that the Supreme Court in Caperton v. A.T. Massey

Coal Co., Inc. cited as examples of unconstitutional risks of bias involved two sets of situations.

First were those cases where a judge had a financial interest in the outcome of the case, although the

interest was less than what common law would have considered personal or direct.  See id. at 2260.

For example, in one case, the mayor of a village had authority to sit as a judge and received a salary

supplement for doing so based on the fines he assessed in a given case.  See id. (discussing Tumey

v. State of Ohio, 273 U.S. 510 (1927)).  In another case, a justice casting the deciding vote to uphold

a punitive damages award against an insurance company for bad faith was, at the time he cast his

vote, the lead plaintiff in a "nearly identical lawsuit" pending in his state's lower courts.  Caperton

v. A.T. Massey Coal Co., Inc., 129 S.Ct. at 2261 (discussing Aetna Life Insurance Co., v. Lavoie,

475 U.S. 813 (1986)).

Second were those cases arising in the criminal contempt context, where a judge had no

pecuniary interest in the case but was challenged because of a conflict arising from his participation

in an earlier proceeding.  See Caperton v. A.T. Massey Coal Co., Inc., 129 S.Ct. at 2261.  In such

cases, the Supreme Court described the challenged judge's participation in the earlier proceeding

as a "'one-man grand jury.'"  Id. (quoting In re Murchison, 349 U.S. 133, 133 (1955)).  For example,

in In re Murchison, in the earlier proceeding, a judge examined witnesses to determine whether charges should be brought.  See 349 U.S. at 134.  The judge became convinced that one of the witnesses had committed perjury, charged him with perjury, and ordered him to appear and show cause why he should not be punished for criminal contempt.  See id.  The second witness refused to answer questions based on his entitlement, under state law, to have counsel present.  See id. at 135.  As a result of the witness' refusal to answer questions, the judge also charged him with criminal contempt and ordered him to appear and show cause.  See id.

At the subsequent proceeding in In re Murchison, the same judge who had charged the two witnesses with criminal contempt served as judge over their trial for criminal contempt.  See id.  The judge declined to recuse himself, despite the two defendants' objections to him presiding over the trial.  See id. at 136.  Under those circumstances, the Supreme Court found that the judge's service as judge over the criminal contempt trial violated due process because "[i]t would be very strange if our system of law permitted a judge to act as a grand jury and then try the very persons accused as a result of his investigations."  Id. at 137.

Thus, as the Supreme Court has stated, only in extreme cases will a risk of bias on the part of a judge be sufficient to render a proceeding in front of that judge unconstitutional on due-process grounds.  See Caperton v. A.T. Massey Coal Co., Inc., 129 S.Ct. at 2265 ("This Court's recusal cases are illustrative. In each case the Court dealt with extreme facts that created an unconstitutional probability of bias.").  Duprey has not alleged any facts that suggest that this case is one of those extreme ones.  She has not argued that individuals involved in decision-making roles in the grievance hearing had financial interests in the outcome of the grievance hearing that would give rise to a probability of actual interest or of bias.  Moreover, while Park appears to have played a decision-making role in the internal grievance investigation, there are not facts in the record that she

-55-

had a financial stake in the result of the grievance hearing or that she was a decision maker in a subsequent proceeding based on the conclusions she drew in her grievance-investigation report. Finally, any suggestion that a district court to which she would have filed a petition of certiorari would be biased against her cannot, without substantiating facts, support an argument that her post-deprivation proceeding would have been constitutionally deficient.  This case therefore is not one that implicates due-process violations because of potential bias in the proceedings.

In her affidavit, Duprey states: "I had an expectation that this grievance board would be individuals who did not know me, had never had an opportunity to meet me and had no predisposition about me.  I do not think that was done and I do not believe it was a fair and impartial panel."  Duprey Aff. ¶ 5, at 2.  An individual receiving a hearing is not entitled to one composed of decision-makers who do not know him or her, have never had the opportunity to meet him or her, or have no predisposition about him or her.   In an internal employment grievance matter, accomplishing such a task might be unreasonably difficult.  But, even outside the employment context, individuals are not necessarily constitutionally entitled to a judge who they have never met, or a jury composed of persons who they do not know.  It may be that other legal mechanisms are in place to assure that, for example, a judge who knows an individual, will recuse himself or herself from a matter in which that individual is a party if there is an appearance of impartiality or bias. Even so, as Supreme Court precedent demonstrates, the due-process clause requires recusal in only extreme circumstances.

Accordingly, the grievance hearing, combined with the possibility of filing a petition for certiorari to review the grievance board's decision, constituted due process.  The evidence that Duprey offers confirms such a conclusion.  Given that the hearing fulfilled the requirements of due process, Park's involvement in arranging that hearing, which was, in any case, minimal, did not

cause a deprivation without due process of law.

    **B.**    **PARK'S ACTIONS RELATED TO THE INTERNAL-GRIEVANCE INVESTIGATION DID NOT RESULT IN THE DEPRIVATION OF A CONSTITUTIONALLY-PROTECTED INTEREST.**

Aside from Park's alleged failings with regard to the grievance proceeding, the other set of allegations against her relate to the manner in which she conducted the internal-grievance investigation that Duprey requested. That cluster of allegations fails to state a claim for deprivation of procedural due process because Park's actions did not result in a deprivation of any constitutionally protected liberty or property interest. The Court will therefore dismiss the due-process claim against Park for events related to the internal-grievance investigation.

"A due process claim . . . can only be maintained where there exists a constitutionally cognizable liberty or property interest with which the state has interfered." Steffey v. Orman, 461 F.3d 1218, 1221 (10th Cir. 2006). In this case, Duprey requested an investigation under the Harassment Policy for a hostile work environment. See Duprey Aff. ¶ 14, at 5. According to Duprey, the investigation was the first of its kind that Park had conducted, despite Duprey's request that she receive someone with experience. See id. ¶ 15, at 5.

Duprey alleges that Park concluded her investigation and never spoke to any of Park's witnesses. See id. ¶ 16, at 6. Rather, Duprey insists, Park interviewed only witnesses favorable to the parties against whom Duprey had filed the complaint. See id. Duprey concedes, however, that she was interviewed as part of the investigation. See id. ("I was the only one interviewed by Ms. Park regarding 'my' complaint of Harassment and a hostile work environment."). Finally, Duprey insists that Park should have come back to her after the interviews with the two subjects of her complaint, and given her the opportunity to respond to the comments and/or provide documentation. See id. ¶ 19, at 7.

Admittedly, the results of Park's internal-grievance investigation were not favorable to Duprey. In the letter to Duprey outlining the conclusions of the investigation, Park informed Duprey:

> Based on interviews, the complaint of a hostile work environment in the 12th Judicial District Court Clerk's office was substantiated. Your accusations that Ms. Perry and Judge Parsons perpetuate the hostile work environment was not substantiated. While it is not my intention to be harsh but rather factual based upon interview responses and conclusions drawn, the perpetrator of the hostile work environment would seem to be yourself, rather than Ms. Perry or Judge Parsons.

March 5 Letter at 2. Furthermore, Park reported to Duprey that "[m]any of those interviewed expressed feelings of fear and intimidation and many were apprehensive of retaliation from you. You were viewed as vindictive by some." Id. at 3. Park also noted: "There have been several clerks . . . to resign from the clerk's office recently. Some of those who have recently left the court indicated that you played a role in their decision to leave." Id. In her concluding remarks, Park proposed:

> Please remember all staff are expected to refrain from any type of retaliation. As you know, the Judicial Branch has a zero tolerance for what may be deemed harassment. In accordance with New Mexico Judicial Branch Personnel Rules (NMJBPR), harassment shall not be tolerated in the work place and you are protected from any type of retaliation in response to your participation in this harassment/hostile work environment investigation.

March 5 Letter at 5.

Duprey's affidavit and Park's letter both support the Court's conclusion that, while Park did not achieve the result she wanted from the internal-grievance investigation, no negative action was taken with regards to her. Park's letter to her informs her, in fact, that she would not be subject to retaliation because of her decision to request a grievance investigation against Defendants Jan Perry and the Honorable Karen L. Parsons, Chief Judge of the Twelfth Judicial District Court for Lincoln and Otero Counties. See March 5 Letter at 5 (explaining that "you are protected from any type of

retaliation in response to your participation in this harassment/hostile work environment investigation").

Presumably, Duprey wanted the Administrative Office of the Court to take punitive action of some kind against Perry and Parsons. Ultimately, however, Park concluded that no such punitive action was in order. Such a result, while not what Duprey was hoping to attain, did not deprive Duprey of anything, such as a constitutionally germane liberty or property interest. There is no case law supporting the proposition that due-process requires that an employee seeking to have a fellow employee punished actually succeed in securing some punishment. Rather, the Supreme Court has described "the root requirement of the Due Process Clause as being that an individual be given an opportunity for a hearing before he is deprived of any significant property interest." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542.

In this case, even if Duprey suffered a constitutionally significant deprivation because of Park's actions in conducting the grievance investigation – and the Court finds that she did not – Duprey also received an adequate opportunity to be heard. As Duprey admits in her affidavit, she was interviewed as part of the investigation. Thus, whatever impact the negative result of the investigation had, Duprey was furnished the opportunity to be heard and to respond. See Lee v. Regents of University of California, 221 Fed.Appx. at 713 (affirming the district court's finding that pre-deprivation interviews by a human resources officer "showed that [the plaintiff] was provided with notice and an opportunity to respond, which was all that due process required"). In short, there was no deprivation of a constitutionally protected liberty or property interest flowing from the grievance investigation, and if there had been, Duprey had ample opportunity to respond and to be heard.

## VI.   HATCHER DID NOT TAKE ANY ACTION THAT AMOUNTS TO A DUE-PROCESS VIOLATION.

Besides implicating Park, Duprey has asserted due-process claims against Hatcher.  Duprey alleges that Hatcher shares in Park's liability for the lost record because of Hatcher's position as Human Resources Director and supervisor to Park.  See Duprey Aff. ¶¶ 5-8, at 2-3.  Duprey also alleges other acts that she believes deprived her of due-process, including a "barely audible" recording of the December 5 hearing, id. ¶ 10, at 3, assembly by Hatcher of a grievance panel consisting of individuals with whom Duprey had a conflict, see id. ¶ 5, at 2, inadequate time for the grievance proceeding, see id. ¶¶ 12-13, at 4-5, and Hatcher's failure to task Duprey's requested investigation under the Harassment Policy to someone with more experience than Park, see id. ¶ 14, at 5.  Furthermore, Duprey has alleged that Hatcher caused Duprey not to have enough time for her grievance hearing, see id. ¶ 12, at 4 ("Ms. Hatcher did not set out enough time for this grievance hearing.  Given the nature of the grievance and the parties involved, it should have been evident that this hearing would take at least two days . . . .  Consequently, the hearing was rushed and I did not receive a fair hearing on either day."), and to have failed to prevent Park's improper conduct, see id. ¶ 20, at 7.

A careful review of the due-process related allegations against Hatcher reveals that a the due-process claim against her is derivative of the claim against Park.  Duprey largely bases her due-process claim on Hatcher's supervisory position over Park.  Accordingly, because the due-process claim against Park fails, any claim based on Hatcher's failure to properly supervise or instruct Park in carrying out her duties must also fail.  Hatcher's activities, which are one step removed from Park's, no more resulted in due-process violations than Park's did.

To the extent that the claim rests on allegations of Hatcher's direct involvement in the

grievance investigation and the grievance hearing, those claims must also fail for similar reasons. The Court has held that the grievance hearing and the grievance investigation were constitutionally sufficient.  Thus, claims against either Park or Hatcher to the effect that those proceedings were deficient fail to state a claim.  Accordingly, the Court will dismiss the due-process claims as against Hatcher and against Park.

## VII.    THE COURT WILL NOT DISMISS THE PUNITIVE-DAMAGES CLAIMS AT THIS TIME.

The Defendants have also moved for the Court to dismiss the punitive-damages claims that Duprey has brought against them.  In support of their position, the Defendants argue that Hatcher and Park are not subject to suit for constitutional violations, or for violations under the NMHRA or Title VII.  Accordingly, the Defendants contend that they are not subject to punitive damages. Given the Court's rulings on this motion, however, the Court finds that it is not appropriate to dismiss the punitive-claim at this time.

"[A] jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  Smith v. Wade, 461 U.S. at 56. Moreover, punitive are available under Title VII in situations where a plaintiff demonstrates that a defendant discriminated with malice or with reckless indifference to federally protected constitutional rights.  See Hysten v. Burlington Northern Santa Fe Ry. Co., 530 F.3d at 1278.

In this motion, the Court has, pursuant to Duprey's concession, dismissed the Title VII claims against Hatcher and Park because they are not amenable to individual liability under Title VII.  Thus, Duprey cannot recover punitive damages based on Title VII.  Nevertheless, although the Court has dismissed the due-process claims against Hatcher and Park, a claim under 42 U.S.C. §

1983 remains.  Neither Hatcher nor Park have moved for dismissal of the equal-protection claim in

Count VI of the Complaint, except to the extent that Park's immunity argument can be construed

to cover all asserted constitutional claims against her.[4]  They have not briefed the issue, nor has

Duprey had the opportunity to brief it.  Accordingly, the equal-protection claim against Park and

Hatcher remains alive.

Count VI alleges that "Defendants Parsons, Mathis, Perry, Hatcher and Park are individually

liable in their official capacities to Plaintiff for said violations, pursuant to 42 U.S.C. § 1983."

Complaint ¶ 83, at 17.  Because that claim is still part of the case at this time, the Court cannot

properly say that no punitive damages are available.  The Court will therefore decline to dismiss the

punitive-damages claim that Duprey has brought against Hatcher and Park.  If either Hatcher or Park

believe there are grounds to dismiss the equal-protection claim against them, they may move the

Court to do so.  At this time, however, the Court will not grant relief that has not been sought.

## VIII.   THE COURT WILL NOT AWARD ATTORNEYS' FEES OR SANCTIONS.

In their motion to dismiss, Hatcher and Park ask for their attorneys fees pursuant to 42

U.S.C. § 1988, and for sanctions against Duprey's attorney pursuant to rule 11.  Hatcher and Park

---

[4]  The Court notes that Hatcher and Park moved, in an earlier motion, for dismissal of the equal-protection claim based on the theory that it was an impermissible class-of-one claim.  See Defendants' Motion to Dismiss, filed September 23, 2008 (Doc. 12).  Duprey disclaimed any attempt at making a class of one claim.  See Plaintiff's Response in Opposition to Defendants' Motion to Dismiss Count [VI] (Documents 12 and 13) at 1, filed October 5, 2008 (Doc. 18).  In a Memorandum Opinion and Order entered June 22, 2009, the Court dismissed any class-of-one claim that Duprey might be attempting to state and held that, as far as that motion was concerned, Duprey had stated a viable equal-protection claim not rooted in the class-of-one theory.  See Memorandum Opinion and Order at 12-13, entered June 22, 2009 (Doc. 43).  The Court did not otherwise explore the merits of the equal-protection claims.  If Hatcher and Park believe the record does not support an equal-protection claim for reasons other than those expressed in the earlier motion rooted in the class-of-one arguments, they may bring an appropriate motion to dismiss or motion for summary judgment.

insist that such sanctions are warranted for Duprey filing and prosecuting "a frivolous lawsuit against him." Motion at 2. The Court disagrees with Hatcher and Park, and will not award them fees or impose sanction.

### A.   THERE IS NO SOUND REASON TO SHIFT COSTS FOR THIS MOTION PURSUANT TO 42 U.S.C. § 1988.

"It is the general rule in the United States that in the absence of legislation providing otherwise, litigants must pay their own attorney's fees." Christianburg Garment Co. v. EEOC, 434 U.S. 412, 415 (1978). Nevertheless, 42 U.S.C. § 1988 provides that, for actions brought under 42 U.S.C. § 1983, "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs. . . ." 42 U.S.C. § 1988.

"While a prevailing plaintiff ordinarily is entitled to attorney fees, a prevailing defendant in a civil rights action may recover attorney fees only if the suit was vexatious, frivolous, or brought to harass or embarrass the defendant." Mitchell v. City of Moore, 218 F.3d 1190, 1203 (10th Cir. 2000)(citations and internal quotations omitted). "[R]arely will a case be sufficiently frivolous to justify imposing attorney fees on the plaintiff." Id. (citing Clajon Prod. Corp. v. Petera, 70 F.3d 1566, 1581 (10th Cir. 1995)). The fact that a district court dismissed a plaintiff's case on summary judgment does not automatically entitle a prevailing defendant to attorney's fees. See id. (citing Jane L. v. Bangerter, 61 F.3d 1505, 1513 (10th Cir. 1995)). If the losing plaintiff's case was vexatious, frivolous, or brought to harass or embarrass the defendant, the court can award fees even if the plaintiff did not bring his case in bad faith. See Clajon Prod. Corp. v. Petera, 70 F.3d at 1581 (quoting Hughes v. Rowe, 449 U.S. 5, 14 (1980)). The Supreme Court has warned district courts against engaging

> in post hoc reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation. This kind of

-63-

> hindsight logic could discourage all but the most airtight claims, for seldom can a prospective plaintiff be sure of ultimate success. No matter how honest one's belief that he has been the victim of discrimination, no matter how meritorious one's claim may appear at the outset, the course of litigation is rarely predictable. Decisive facts may not emerge until discovery or trial. The law may change or clarify in the midst of litigation. Even when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit.

Christiansburg Garment Co. v. EEOC, 434 U.S. at 421-22 (discussing awards to prevailing defendants in Title VII cases). See Jane L. v. Bangerter, 61 F.3d at 1513 (recognizing that the Supreme Court adopted Christiansburg Garment Co. v. EEOC's reasoning for attorney's fees under § 1988 in Hensley v. Eckerhart, 461 U.S. 424, 429 n.2 (1983)). Subjective bad faith is not part of the attorney's fees analysis.

In this case, the Court has granted Hatcher and Park's motion in part and has denied it in part. As a threshold matter, the Court cannot rightfully find that they are completely prevailing parties at this time entitled to attorney's fees. Moreover, the Court sees no need to shift costs at this time.

The Court also believes that Duprey is pursuing her lawsuit in good faith, and for purposes other than harassment or vexation. "Even when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit." Christiansburg Garment Co. v. EEOC, 434 U.S. at 421-22. The claims that the Court has dismissed against Hatcher and Park may have been difficult to maintain under governing precedent. At the same time, the Tenth Circuit case most relevant to the dismissed claims was an unpublished opinion that relied on out-of-circuit law. The Court cannot say, on the record before it, that Duprey was unreasonable in asserting her due-process claims against Hatcher and Park. The Court does not believe there is a need to punish Duprey for bringing her claim and testing the law in this area. The Court will therefore exercise its discretion and deny the request for attorney's fees under 42 U.S.C.

§ 1988.

**B.    RULE 11 SANCTIONS ARE INAPPROPRIATE HERE.**

The request for sanctions under rule 11 comes, like the request for attorney's fees, under the justification that the lawsuit against Hatcher and Park was frivolous.  Again, the Court finds that the lawsuit was brought in good faith and that the claims were reasonable.  Rule 11 sanctions are therefore inappropriate in this case.

Rule 11 states:

**(b) Representations to the Court.** By presenting to the court a pleading, written motion, or other paper--whether by signing, filing, submitting, or later advocating it--an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

> **(1)** it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

> **(2)** the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

> **(3)** the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

> **(4)** the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Fed. R. Civ. P. 11 (bold in original).

Hatcher and Park have not provided evidence that Duprey's lawsuit was brought with an improper purpose, such as harassment, or to increase the costs of litigation.  Furthermore, there is no indication of misconduct, such as misrepresentations, that would warrant sanctions.  See Kirk Capital Corp. v. Bailey, 16 F.3d at 1490.  A boilerplate characterization of Duprey's claim as

frivolous is not enough to find a rule 11 violation.  Rule 11 is not designed to frighten parties or attorneys away from pursuing lawsuits or articulating creative theories of recovery.  Rather, "the primary purpose of Rule 11 sanctions is to deter attorney and litigant misconduct, not to compensate the opposing party for all of its costs in defending." Kirk Capital Corp. v. Bailey, 16 F.3d at 1490.

It is again worth noting that Hatcher and Park were only partially successful in paring down the claims against them.  At this point, constitutional and statutorily based claims against Hatcher and Park have survived, and the ones that the Court dismissed were colorable, and as far as the record reveals, filed in good faith.  The Court therefore declines to impose rule 11 sanctions or to otherwise make an example out of Duprey and/or her attorney for making frivolous or vexatious arguments.

Besides lacking substantive merit, Hatcher and Park's request for rule 11 sanctions is procedurally deficient.  Rule 11 requires parties seeking sanctions to do so in a separate motion. See Fed. R. Civ. P. 11(c)(2).  Moreover, "[t]he motion must be served under Rule 5, but it most not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets." Id.

Rather than following the prescribed method for a rule 11 motion, Hatcher and Park tagged their request for rule 11 sanctions onto the end of his motion to dismiss.  They also bypassed the safe-harbor procedure.  Their failure to adhere to proper procedures and to provide the safe harbor represent additional reasons for the Court to deny the motion for sanctions.

To summarize, the Court will, pursuant to Duprey's concurrence, dismiss the individual claims against Park and Hatcher for violations of Title VII and the Federal Age Discrimination in Employment Act.  Because Park was acting in a non-discretionary, ministerial function, the Court

holds that she is not entitled to quasi-judicial immunity for her actions taken in relation to the grievance hearing.  The Court also finds that, in their capacities in the Administrative Office of the Court, which supports the Twelfth Judicial District, Park and Hatcher acted for the Twelfth Judicial District, Duprey's employer.  Park and Hatcher can be held individually liable under the NMHRA. The Court finds, however, that Duprey has not alleged a due-process violation against either Hatcher or Park because Duprey received the process to which she was entitled – a hearing and an opportunity respond to allegations supporting her demotions – for the deprivation she suffered. Moreover, all of Duprey's allegations related to the internal-grievance investigation fail to give rise to a due-process violation because that internal-grievance investigation, which was conducted at Duprey's initiative, did not result in the deprivation of a constitutionally recognized liberty or property interest.  Finally, because certain 42 U.S.C. § 1983 claims survive against Hatcher and Park, it is not appropriate at this time to dismiss Duprey's punitive damages claim.  The Court also declines to impose rule 11 sanctions or award fees because there is no evidence of misconduct or frivolous filing on the part of Duprey or her attorney.

**IT IS ORDERED** that the Motion to Dismiss Pursuant to F.R.C.P. 12(b)(6) by Defendants Hatcher and Park, which has been converted into a motion for summary judgment, is granted in part and denied in part.  The individual-liability claims against Defendants Lorri Hatcher and Valerie Park brought pursuant to Title VII and the Federal Age Discrimination in Employment Act are dismissed.  The due-process claims against Hatcher and Park are also dismissed.  The motion is otherwise denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Dennis W. Montoya
Montoya Law, Inc.
Rio Rancho, New Mexico

 *Attorneys for the Plaintiff*

Paula Grace Maynes
Miller Stratvert, P.A.
Santa Fe, New Mexico

 *Attorney for the Defendants*